IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| IN THE MATTER OF THE EXTRADITION | ) ) ) ) | No. 06 M 295 |
| OF | ) ) | Magistrate Judge Arlander Keys |
| EDWARD MAZUR | ) ) ) |  |

## EDWARD MAZUR'S POST-HEARING MEMORANDUM

### Introduction

Relator Edward Mazur, by his attorneys, JENNER & BLOCK, LLP, respectfully submits this post-hearing memorandum in opposition to the Government's request for extradition. This memorandum is submitted in order to explain how the Government has failed to establish that Mr. Mazur is extaditable under the Treaty, both because of complete failure to establish certain elements that are conditions precedent to extradition and because the evidence introduced at the hearing does not support a determination that there is probable cause to believe Mr. Mazur committed the offense. Indeed, one item of evidence introduced at the hearing, the photograph of the lineup which witness Zirajewski was shown, so undermines the Government's case and goes so far to establishing the misconduct of the Polish prosecutors, that it alone warrants denial of the extradition petition.

**I.  The Government Has Failed To Establish That This Offense Is Extraditable.**

At the evidentiary hearing, the focus was on the Government's failure to establish probable cause that the Relator committed the offense for which extradition is being sought. But there are other prerequisites to extradition under the Treaty, including the requirement of proof that the offense is covered by the Treaty, that the offense is a felony under Polish law and proof

that the Polish statute of limitations has not run. *Eain v. Wilkes*, 641 F.2d 504, 508 (7th Cir. 1981); Rel. Exh. 19 at 0026 and 0030 (Gov. Vol. I, Exh. 2, Art. 1, 2, and 8). The Government's submission fails to establish any of these prerequisites. Each of these defects requires this Court to deny extradition.

First, the offense for which extradition is sought must be covered by the Treaty. Rel. Exh. 19 at 0026 (Gov. Vol. I, Exh. 2, Art. 1). Mr. Mazur is wanted by Poland on suspicion of having committed the crime of inciting the murder of General Papala.[1] Rel. Exh. 19 at 0247 (Govt. Vol. III, Exh. 27). Polish law defines the crime of incitement as covering "[a]ny person who, wishing another to commit a prohibited act, induces him/her to do so." Rel. Exh. 19 at 0049 (Govt. Vol. II, Exh. 3 (Article 18 Paragraph 1 of the Criminal Code of 1969)). The evidence submitted by the Government establishes, on its face, that Mr. Mazur cannot be guilty of incitement within the meaning of the Polish statute, which requires on its face the commission of the substantive offense. The word "induce" means to lead to do something, to cause something to happen or to prevail upon someone to do something and thus necessarily requires that the person "induced" actually have taken action. *See* Oxford English Dictionary, Def. 1 and 4 of "induce." Mr. Mazur cannot have "induced" anyone to have killed General Papala. The only people the Government says that Mazur supposedly asked to kill Papala were Artur Zirajewski, Andrzej Zielinksi and Nikodem Skotarczyk. Skotarczyk was dead and Zirajewski was in prison a month before Papala was killed. Rel. Exh. 19 at 0356 and 0367 (Govt. Vol. IV, Exh. 16). Zielinski was held in prison until June 1999. Rel. Exh. 19 at 0262 (Govt. Vol. IV, Exh. 3).

---

[1] Both the Polish Government and the United States Government describe the crime for which extradition is sought as "enticement" to murder. Rel. Exh. 19 at 0247 (Govt. Vol. III, Exh. 27) and 0001 (Complaint), citing Article 18 § 1 of the Criminal Code of 1969. However, Article 18 § 1 of the Criminal Code of 1969 defines the crime of "incitement." Rel. Exh. 19 at 0049 (Govt. Vol. II, Exh. 3). For clarity, Relator refers to "incitement" throughout.

Because the plain language of the Polish Criminal Code suggests that incitement requires the commission of the underlying offense by the person "induced," and because Papala cannot have been killed by any of the three people with whom the killing was supposedly discussed, there can be no incitement as a matter of law.

Second, even if the conduct at issue here could amount to incitement, the Government has failed to establish that inducement is an extraditable offense. The extradition treaty between the United States and Poland defines an extraditable offense as an offense that "is punishable under the laws in both Contracting States by deprivation of liberty for a maximum period of more than one year or by a more severe penalty." Rel. Exh. 19 at 0026 (Govt. Vol. I, Exh. 2, Art. 2). Under Polish law, murder is punishable by "a penalty of imprisonment for a period not shorter than 8 years, the penalty of 25 years' imprisonment or life imprisonment," unless certain aggravating factors are present. Rel. Exh. 19 at 0049 (Govt. Vol. III, Exh. 3). However, Mr. Mazur is not accused of murder. Rather, the Polish Government is investigating him for inciting Gen. Papala's murder. None of the materials submitted indicate that incitement to murder is punishable by imprisonment for longer than a year. Homicide is, but the sections of the Polish Criminal Code supplied to the Court do not indicate the punishment for incitement to murder. *Id.*

While the treaty also defines as an extraditable offense any attempt to commit or "association" to commit an extraditable offense, Rel. Exh. 19 at 0026 (Govt. Vol. I, Exh. 2, Art. 2(2)), those are also crimes distinct from the solicitation or incitement crime for which Mr. Mazur's extradition is sought. The structure of Article 2(2) makes it clear that "association" is parallel to the American criminal law concept of conspiracy. In any event, Mr. Mazur was not charged with an attempt to commit murder or "association" to commit murder. He was charged

with incitement, a separate crime that is not covered by Article 2(2). The Government implicitly acknowledges as much by making the statement in its Complaint that incitement is punishable by life imprisonment or 25 years' imprisonment, rather than seeking to treat incitement as "association" or attempt. Rel. Exh. 19 at 0002 (Complaint at 2). But the statement in the Complaint about the penalty for incitement is supported only by a citation to Rel. Exh. 19 at 0049-50 (Govt. Vol. II, Exh. 3), which as we previously noted, defines incitement as an offense and lists the penalty for murder but not for incitement to murder. Because the Government has failed to demonstrate that incitement to murder is an extraditable offense, this Court should dismiss the extradition request.

Third, the Government has failed to demonstrate that the statute of limitations has not run on incitement to murder. The extradition treaty states that "Extradition shall not be granted when the prosecution or the enforcement of the penalty for the offense for which extradition has been sought has become barred by lapse of time according to the law of the Requesting State." Rel. Exh. 19 at 0030 (Govt. Vol. I, Exh. 2, Art. 8). More than nine years have elapsed since April 1998, when the meetings about killing Gen. Papala allegedly took place. While the Government's submission in support of extradition includes the provision of the Polish Criminal Code establishing statutes of limitation, the statutes of limitation are defined based on whether the act is a "felony" and on what the penalty for conviction is. Rel. Exh. 19 at 0049 (Govt. Vol. II, Exh. 3). Because none of the materials provided by Poland indicate whether incitement is a felony or what the penalty for conviction is, the statute of limitations could be as short as 3 or 5 years. *Id.* Without evidence that the prosecution of Mr. Mazur would not be time-barred, this Court should refuse to certify his extradition.

II.     **The Evidence Presented By the Relator, Considered In Its Totality, Demonstrates the Non-Existence of Probable Cause.**

    A.     <u>Colonel Bieszynski's testimony</u>

Colonel Ryszard Bieszynski, a high-ranking former official in the Polish Civil Special Services and a member of the task force that investigated the murder, testified to a number of facts that demonstrate the non-existence of probable cause.

Colonel Bieszynski testified, based on his knowledge of the investigation and the evidence, that Mazur was innocent. Tr. at 42:20-21. His testimony was at substantial risk to himself and with no motivation other than to prevent a miscarriage of justice. Tr. at 42:25-43:22. Col. Bieszynski also testified that Mr. Mazur had been monitored by the Polish security services, and that in all of the files "related to Mr. Mazur, there is not a single information about a single crime or misdemeanor committed by Mr. Mazur, including a parking ticket." Tr. at 72:25-73:2. He went on to say that there was "absolutely . . . no information" indicating that Mr. Mazur had associates in Polish organized crime. Tr. at 73:3-5. He also saw no credible evidence of any motive for Mr. Mazur to have Gen. Papala murdered. Tr. at 73:13.

Bieszynski also testified that he had an informer who "was a vessel through which all the relevant information related to the Warsaw organized crime circles would flow. . . In situations of conflict between different groups, it was the task of that person to reconcile the groups with one another." Tr. at 48:1-21. In Col. Bieszynski's past interactions with the informer, the informer had been "infallible." Tr. at 48:22-49:2. Bieszynski would have testified that the informer had told him that organized crime had no involvement in Gen. Papala's death. This evidence would have obliterated the Government's theory of the case, but the Court refused to

hear it and even refused to allow the Relator to make an offer of proof. Tr. at 54:5-9. The Court should reconsider this ruling and admit the evidence.

Bieszynski also testified, in an offer of proof, based on his decades of experience investigating organized crime, that the supposed meeting between Mr. Mazur and representatives of two or three different organized crime groups was totally implausible. Tr. at 76:8-21. Even if they had met, Col. Bieszynski's testified that $40,000 would not be sufficient to hire an organized crime hit in Poland on the commander of the national police. Tr. at 77:1-10. This testimony was incorrectly excluded, and the Court should consider it.

Bieszynski also credibly testified, based on his knowledge of the evidence from the investigation, that the circumstances of Gen. Papala's death indicated that he permitted his assailant to approach him. Tr. at 78:8-25. Gen. Papala was cautious and used extra precautions when parking. *Id.* However, his killer was able to approach closely and to shoot him without firing through the window or door of the car. *Id.* As a result, Col. Bieszynski was able to deduce that Gen. Papala's killer had to be someone he knew, and that it was thus not an organized crime hit with a hired gunman. Tr. at 80:8-14. The offers of proof regarding Col. Bieszynski underline that conclusion.

But while Col. Bieszynski's testimony obliterates or would have obliterated the Government's case for probable cause, it was also explanatory, demonstrating why the Government's witnesses said what they did: they were being coached to lie. Col. Bieszynski testified in an offer of proof that the Polish prosecutor was pursuing Mr. Mazur not because there were any serious leads supporting it, but because "there was no alternative version available." Tr. at 69:15-24. He also testified in an offer of proof that information about the existence of Artur Zirajewski as a witness, the interview reports that have now been produced, and his ability

to interview Zirajewski directly, were withheld from him because he would have interfered in the Polish Government's efforts to frame Mr. Mazur through Zirajewski's testimony. Tr. at 56:3-17 and 59:11-60-25. Col. Bieszynski's testimony serves to confirm what was clear from the Government's presentation: the Polish prosecutors set out to frame Mr. Mazur and carefully shaped testimony in an effort to implicate him.

The Government sought to discredit Bieszynski because he has been charged in Poland by one prosecutor for arresting a highly placed businessman on a warrant issued by a different prosecutor. Tr. at 39:7-40:18. While that allegation destroyed Bieszynski's career, it has absolutely nothing to do with his credibility as a witness. For instance, Fed. R. Evid. 609 permits impeachment of a witness with evidence that he has been <u>convicted</u> of a crime in certain circumstances. But the fact that the witness has been accused of a crime is utterly irrelevant. *See United States v. Chance*, 306 F.3d 356, 385 (6th Cir. 2002) ("a witness may not be impeached by evidence that he or she was indicted for a crime, since an indictment is not any evidence of guilt"). The only relevance of this incident here is to demonstrate the capriciousness of the Polish prosecutorial services, which have now trained their sights on Mr. Mazur.

B.    The evidence concerning June 25, 1998

The entire foundation for this prosecution can be traced to one fact: that Mr. Mazur met with General Papala on the night he was killed. But on that point, the defense offered uncontradicted explanatory evidence that demonstrates that there was a perfectly innocent reason for the two to meet. Mr. Mazur testified by affidavit that Gen. Papala was scheduled to travel with him to the United States to attend an English language class in June 1998. Rel. Exh. 24 at ¶ 4. Mr. Mazur had assisted Gen. Papala in enrolling in that class. *Id.* at ¶ 3. On June 25, 1998, Mr. Mazur contacted Gen. Papala to discuss the trip and Gen. Papala asked to meet with him to

discuss the trip and to determine whether it would be possible to begin the English classes later in the summer. *Id.* at ¶ 5. They met at Gen. Sasin's home, where Mr. Mazur was for a social event, for approximately 30 to 40 minutes. *Id.* at ¶¶ 5-7. Mr. Mazur made no effort to conceal the meeting and agreed to be interviewed by the police later that night when he was informed that Gen. Papala had been shot. *Id.* at ¶ 8. Furthermore, Paul Weinstein the General Counsel of Berlitz International, Inc., the parent company of ELS Educational Services, Inc., testified by affidavit that Marek Papala was enrolled in an intensive English language program to be given at Dominican University, starting on June 29, 1998. Rel. Exh. 15 at ¶ 5. Gen. Papala's enrollment listed his address as 3611 Lawson, Glenview, Illinois-- Mr. Mazur's address. *Id.* Mr. Weinstein's testimony confirms that there was a perfectly innocuous reason for Mr. Mazur's meeting with Gen. Papala on the night of Gen Papala's murder.

**III.    The Government's Evidence Does Not Support a Finding of Probable Cause**

      A.    <u>Artur Zirajewski</u>

The Government's entire story rests on the testimony of Artur Zirajewski. Zirajewski told investigators that Mr. Mazur hired him to arrange Gen. Papala's murder. But in order to evaluate whether that testimony supports a finding of probable cause, this Court must consider the circumstances behind Zirajewski's testimony.

Zirajewski is a career criminal with every reason to lie, and a demonstrated penchant for doing so--about the very facts at issue here. He has been held in prison for nine years, including at least three years in isolation that by his own admission affected his psyche. Rel. Exh. 19 at 0356 (Govt. Vol. IV, Exh. 16); Rel. Exh. 19 at 0178 (Govt. Vol. III, Exh. 5). We also know, based on his own testimony, that Zirajewski gave his testimony in the expectation that it would reduce his prison sentence. Rel. Exh. 19 at 0178 (Govt. Vol. III, Exh. 5). And indeed, that

expectation was fully satisfied: he was given a sentence of only twelve years imprisonment for the brutal murder by torture of Piotr Sulej, a crime for which he could have received life imprisonment. Rel. Exh. 19 at 0356 (Govt. Vol. IV, Exh. 16).

We also know that Zirajewski has been "interviewed" over and over by the Polish police, at least sixteen times over a five-year period prior to the request for Mr. Mazur's arrest--providing ample opportunity for him to tailor his testimony to suit the prosecution's needs. In fact, we cannot be sure that there were not many other interviews in this period. We do know the Polish Government chose to withhold at least one interview transcript, because it was referenced in one of the other interviews but not included in the information supplied by Poland for this extradition proceeding. Rel. Exh. 19 at 0184 (Govt. Vol. III, Exh. 7). The interview transcripts even create doubt as to their reliability on their face: many of the key interview reports have completely inconsistent dates listed for when they started and when they concluded, with no explanation for the discrepancy. Rel. Exh. 19 at 0214 (Govt. Vol. III, Exh. 15, Aug. 19, 1999 interview concluding on Apr. 6, 1999), 0170 (Govt. Vol. III, Exh. 3, Sept. 9, 1999 interview concluding on Apr. 9, 2002), 0180 (Govt. Vol. III, Exh. 6, Apr. 9, 2002 interview concluding on Mar. 9, 2002), and 0186 (Govt. Vol. III, Exh. 7, Jan. 7, 2003 interview concluding on Feb. 7, 2003). There can be no legitimate reason for these discrepancies, and the government has offered none. One thing, though, is certain: the discrepancies were not introduced by translation errors. Even without the ability to read Polish, the dates can be confirmed by examining the Polish versions of the documents submitted as part of the extradition package.

As if the role of Zirajewski's imprisonment and desire to cut a deal was not sufficient indicia of his stories' lack of credibility, Zirajewski testified explicitly that he lied under oath to the Polish Government about these very incidents. Rel. Exh. 19 at 0183 (Govt. Vol. III, Exh. 7).

Moreover, Zirajewski admitted having read news articles about Gen. Papala's murder. Rel. Exh. 19 at 0175 (Govt. Vol. II, Exh. 5). Of course, the Polish media was filled with articles discussing the day of Gen. Papala's murder, including articles speculating that Mr. Mazur was involved in the murder. Rel. Exh. 6, 7, 10, 11, 12, and 26. Some of the articles in the Polish media even included Mr. Mazur's photograph. Rel. Exh. 26. All that Zirajewski needed to do to construct a completely false story implicating Mr. Mazur was to figure out what the Polish authorities wanted him to say and to then sprinkle in whatever facts he had gathered from the news articles that he had read.

Even if the Court believes that the circumstances underlying Zirajewski's testimony do not render it worthless, the testimony itself demolishes any showing of probable cause. Zirajewski gave testimony on several occasions that completely exculpated Mr. Mazur from any involvement in a plot to kill Gen. Papala. On April 10, 1999, he admitted knowing of and participating in a series of discussions about killing Gen. Papala, but made no reference to involvement by Mr. Mazur--or even by someone who could later be linked up to Mr. Mazur. Rel. Exh. 19 at 0171-73 (Govt. Vol. III, Exh. 4). On May 30, 2001, Zirajewski testified about two meetings, and put "Bako"-- a figure that the Government wants us to believe is Mr. Mazur-- at one of those meetings. Rel. Exh. 19 at 0216 (Govt. Vol. III, Exh. 15). But the crucial fact about this testimony is that Zirajewski admitted that "Bako" was not at the meeting where a killing was discussed, and a killing was not discussed at the meeting that "Bako" was at. *Id.* In other words, in order to find probable cause, the Court must not only conclude that a persistent liar with an obvious motivation to tailor his testimony to serve the Polish prosecutors' needs nonetheless is credible and told the truth, but must further conclude that he told the truth when he

said things convenient to the prosecutors' story, and not when he denied that Mr. Mazur was involved.

Even leaving aside the specific instances when Zirajewski exculpated Mr. Mazur, his testimony is so riddled with inconsistencies that it cannot support a finding of probable cause. Take the first meeting at the Marina hotel. Zirajewski described it in seven different interviews. Rel. Exh. 19 at 0172-73 (Govt. Vol. III, Exh. 4), 0213 (Govt. Vol. III, Exh. 15), 0169 (Govt. Vol. III, Exh. 3), 0216 (Govt. Vol. III, Exh. 16), 0175 (Govt. Vol. III, Exh. 5), 0202 (Govt. Vol. III, Exh. 12), and 0183 (Govt. Vol. III, Exh. 7). Out of all of those interviews, no two have the same list of people present. *Id.* "Bako," who the Polish prosecutors later concluded was Mr. Mazur, was only present in one of those accounts. *Id.* Moreover, whether and to what extent Gen. Papala's murder was discussed at the first Marina meeting varied from a few fragments about "getting rid of this dog," to no discussion of the killing to discussion which he ignored and cannot recount in detail. *Id.*

The prosecution argues that these variations represent the vagaries of memory and that it would not be reasonable to expect him to remember every detail about every meeting, but the entire basis for this extradition depends on Zirajewski's ability to accurately and definitively place Mr. Mazur at a meeting where he solicited Gen. Papala's murder. Because Zirajewski is not sure who he met with, there is no reason to find probable cause regarding Mr. Mazur's involvement.

In addition to changing his mind over time about who the other people involved in the plot were, Zirajewski also varied his own role in the plot. Zirajewski sometimes stated that someone named "Sergey" was hired to be the actual hitman. Zirajewski's earliest mention of Sergey describes Sergey as bringing in Zirajewski: Sergey had been hired by Nowosad to "do" a

policeman, and Sergey asked Zirajewski to negotiate his payment. Rel. Exh. 19 at 0172 (Govt. Vol. III, Exh. 4). In two later accounts, Zirajewski claimed to have made the decision to hire Sergey in the first place. Rel. Exh. 19 at 0213 (Govt. Vol. III, Exh. 15) and 0176 (Govt. Vol. III, Exh. 5). And in yet other interviews, Zirajewski leaves out Sergey altogether. Rel. Exh. 19 at 0215-17 (Govt. Vol. III, Exh. 16) and 0182-87 (Govt. Vol. III, Exh. 7). Like the participants at the Marina meeting, Sergey's involvement changes across the course of Zirajewski's testimony, with him fading in and out of participation and playing different roles in different interviews. The clear inference is that Zirajewski continuously adjusted his testimony as the Polish prosecution's theory of the case changed. And by always giving them what they wanted, he demonstrated that none of his statements could be considered truthful.

Zirajewski's testimony about Ryszard Bogucki was more of the same. Zirajewski initially did not mention Bogucki at all. Rel. Exh. 19 at 0171 (Govt. Vol. III, Exh. 4). The earliest mention of Bogucki by Zirajewski was simply the statement "I do not know whether Bogucki knew Sergey, from what I know Nikodem did not know Sergey." Rel. Exh. 19 at 0169 (Govt. Vol. III, Exh. 3). But then Bogucki's role grew: Zirajewski stated that Skotarczak said that Bogucki "knew the matter" and "asked me if the hitman was good" at a meeting prior to the second Marina meeting. Rel. Exh. 19 at 0176 (Govt. Vol. III, Exh. 5). In this version, Bogucki went to Gdynia while Zirajewski and Skotarczak went to the second Marina meeting. *Id.* Later, Zirajewski testified that Bogucki had been at the first Marina meeting, although he left early and may or may not have been around for discussions of Gen. Papala's murder. Rel. Exh. 19 at 0183 (Govt. Vol. III, Exh. 7). Bogucki's role, like everything else, changed to fit whatever version of the story the prosecution was pursuing at the time.

Zirajewski not only changed his testimony about who participated in the discussions of the killing of Gen. Papala, but he even changed his testimony about who the subject of the contract was. His initial testimony was very vague, but somehow he later became sure that it was specifically a contract on Gen. Papala with Mr. Mazur even handing him a photograph and a newspaper article about the General to make the story as clear as possible. In Zirajewski's original story in April of 1999, he heard only that they would be getting rid of a "dog," with a later statement that that was an unnamed police general. Rel. Exh. 19 at 0172 (Govt. Vol. III, Exh. 4). A few months later in August, a "name was mentioned, but at that time I did not memorize it. . . . Since the news of General Papala's murder, I remember his name." Rel. Exh. 19 at 0212 (Govt. Vol. III, Exh. 3). A month after that statement, he adds the flourish of a newspaper photo of Gen. Papala. Rel. Exh. 19 at 0169 (Govt. Vol. III, Exh. 3). But then he backtracks-- in May of 2001, he states that he had heard the name of Gen. Papala, but could not recall in what context, except that "I have never heard this name [Papala] in a context of a contract for killing this person. On the basis of my own considerations, <u>I built such a hypothesis</u>. <u>I put together overheard fragments and passed it in this way in the form of testimony.</u>" Rel. Exh. 19 at 0216 (Govt. Vol. III, Exh. 16) (emphasis added). We do not need to speculate whether Zirajewski could take clues from the prosecutors, media coverage, and snippets of overheard rumor and stitch it together into sworn testimony. We have his own testimony admitting that he had done precisely that.

By February of 2002, Zirajewski reverts to testifying that there were clear discussions about killing General Papala and a newspaper clipping with Gen. Papala's picture. Rel. Exh. 19 at 0176 (Govt. Vol. III, Exh. 5). But even then, Zirajewski could not stick to his story. By January of 2003, he was back to saying that the name meant nothing to him when he heard it, but

that he later put it together when he heard information in the media about the murder of the Commander General of the Police. Rel. Exh. 19 at 0184 (Govt. Vol. III, Exh. 7). Zirajewski admits in so many words to figuring out the details of his testimony with the help of news articles, inference, and guess work.

      B.    <u>Zirajewski's identification of the Relator</u>

No examination of Zirajewski's testimony would be complete without discussing the issue of his identification of Mazur. Zirajewski repeatedly stated that he was unable to describe Mr. Mazur, or figures like "Bako" that the Polish authorities concluded were Mr. Mazur. Rel. Exh. 19 at 0213 (Govt. Vol. III, Exh. 15), 0216 (Govt. Vol. III, Exh. 16), and 0176 (Govt. Vol. III, Exh. 5). Moreover, Zirajewski failed to identify Mr. Mazur in a photo spread. Rel. Ex. 19 at 0169 (Govt. Vol. III, Exh. 3). In fact, the only time that Zirajewski did identify Mr. Mazur was in a highly suggestive line-up. Rel. Ex. 19 at 0196 (Govt. Vol. III, Exh. 10).

The events of February 27, 2002, the date of the line-up, are revealing. At about 11 a.m., Zirajewski made a sworn statement in which he testified that "[a]t this moment I am unable to give a description of either Slowik or Mazur. . . ." Rel. Exh. at 0176 (Govt. Vol. III, Exh. 5). A few hours later, he was presented with a four-man lineup that made it perfectly clear who Zirajewski was "supposed" to identify. Govt. Hearing Exh. 7. As the Government's witness, Special Agent Boertje, testified, the other participants in the line-up did not resemble Mr. Mazur. Hearing Tr. at 146:1 to 148:24. They also wore very different clothing, with Mr. Mazur in suit slacks and a button-down, dress shirt while the others were wearing other, neutral colored clothes. *Id.* at 148:25-150:2. The clincher, though, is that Mr. Mazur was put in a <u>bright red jacket</u> that made him stand out as the person who the prosecutors had targeted. That lineup was so suggestive as to be meaningless. Worse, it locked in Zirajewski to an identification of

someone who he had previously said he could not even describe.  Without the identification from that suggestive line-up, there is absolutely nothing connecting Mr. Mazur to Zirajewski's ever-changing story.

Indeed, the clearest proof that even the Polish prosecutors knew the line-up was unreliable is that they sent hundreds of pages of documents, some with only the most dubious connection to their case, but they did not send any photos of the line-up until days before the hearing.  They knew that any American judge would see the line-up for a farce.   See *Israel v. Odom*, 521 F.2d 1370, 1374 (7th Cir. 1975) (line-up where only the suspect was wearing glasses was improper and unnecessarily suggestive).  The courts have been particularly critical of line-ups involving distinctive clothing:  "there is no justifiable reason for not allowing the suspected individual  to remove highly distinctive clothing or in the alternative to supply similar clothing to others in the lineup."  *United States ex rel. Pierce v. Cannon*, 508 F.2d 197, 201-02 (7th Cir. 1974).

The situation here is even more aggravated because the red jacket was supplied by the police conducting the lineup.  But even if Mr. Mazur himself had chosen to wear the jacket, the lineup would still have been improper.  As the *Israel* Court stated in concluding that it did not matter whether the police had required the suspect to wear glasses, "The suggestiveness of the identification procedure results, not from police motive or misbehavior, but from the fact that Odom was the only lineup participant to be wearing glasses."  *Israel*, 521 F.2d at 1374 n.7.  There is no requirement that the Polish Government comply with United States standards of Due Process, but the blatant failure to conduct a fair line-up demolishes its value for establishing probable cause in this Court, and with it the value of any of Zirajewski's testimony.

The Government wants to focus the Court's attention on the fact that Mr. Mazur erroneously said in his affidavit that he was dressed in a suit during the line-up. Indeed, the Government's over-heated argument repeatedly described Mr. Mazur's mistake as a "lie under oath," "perjury," and "mendacity." *See, e.g.,* Tr. at 127:19-25. But the truth is much simpler and more obvious: Mr. Mazur wore a suit on the day of the line-up and forgot that he had removed his suit jacket and tie prior to the line-up itself. He was, in fact, unique among the participants in the line-up in that he was wearing suit slacks and a dress shirt. The more important point is that the photos of the line-up, with Mr. Mazur singled out in a bright red jacket, demonstrate its suggestiveness even more clearly than Mr. Mazur's flawed memories. Mr. Mazur could have no possible motive to lie when the truth would have been even more helpful, and the Government's emphasis on his so-called "perjury" should not be allowed to obscure the fact that the identification that serves as the lynch-pin of Zirajewski's testimony was hopelessly flawed and should be disregarded.

> D.     The remainder of the Government's witness statements

Zirajewski's testimony cannot justify a finding of probable cause. The question then becomes whether the other testimony that the Polish Government submitted could. An examination of that evidence demonstrates, however, that the other witnesses do even less to create a plausible, let alone probable, account of Mr. Mazur's involvement than Zirajewski.

Only one other witness directly testified to Mr. Mazur's involvement in solicitation to murder Gen. Papala: Andrzej Zielinski, a.k.a. "Slowik." But Slowik's testimony is even weaker than Zirajewski's. Slowik has a long criminal record, including convictions for bribing public officials that directly implicate his reliability as a witness. Rel. Exh. 19 at 0359-61 (Govt. Vol. IV, Exh. 16). And before he implicated Mr. Mazur, Slowik twice testified that he did not know

Mr. Mazur and was not involved in a solicitation for Gen. Papala's murder. Rel. Exh. 19 at 0219 (Govt. Vol. III, Exh. 17) and 0292 (Govt. Vol. IV, Exh. 5). While Slowik did finally testify that he met with Mr. Mazur and discussed murdering Gen. Papala, even then his testimony bore no resemblance whatsoever to Zirajewski's description of what was ostensibly the same meeting. Rel. Exh. 19 at 0219 (Govt. Vol. III, Exh. 17) and 0260-61 (Govt. Vol. IV, Exh. 3). In particular, Slowik categorically denied having ever met Zirajewski. *Id.* He also testified that the only people at the meeting at the Marina restaurant were Mr. Mazur, Skotarczak, and Slowik-- a description of the meeting that does not resemble any of the versions described by Zirajewski, and about which Zirajewski would have been unable to testify. *Id.* He also explicitly denied Zirajewski's claims that Mr. Mazur showed a photograph of Gen. Papala, made a call on his cell phone during the conversation, or discussed a price. Rel. Exh. 19 at 0262 (Govt. Vol. IV, Exh. 2). Indeed, even Slowik's claim that Gen. Papala's murder was discussed included the clear statement that no agreement was reached. Rel. Exh. 19 at 0261 (Govt. Vol. IV, Exh. 2).

To be clear, the Government purports to not only be able to tell the Court which statements of Slowik were false and which one was true, but to be able to sift half-truths out of the one statement implicating Mr. Mazur. The Government's own argument is that every one of Slowik's statements contained material false statements, including the one they now rely upon. However, they say, in the one statement that implicated Mr. Mazur, Slowik's accusation of Mr. Mazur was true, even though the rest of the statement is false. The Government's guesses about when Slowik lies and to what extent do not constitute probable cause.

The other "witnesses" do not even purport to implicate Mr. Mazur in any crime. Mrs. Papala testified as to a collection of undisputed facts: Mr. Mazur had contacts with Gen. Papala, including meeting with him on the night of his death. Rel. Exh. 19 at 0342-43 (Govt. Vol. IV,

Exh. 13). No surprises there--Mr. Mazur states as much himself. Ryszard Przybyla, Slawomir Trella and Marcin Puczynski each state that they saw Mr. Mazur with a mob figure-- Slowik in the case of Przybyla, Skotarczak in the case of Trella, and Kanigowski in the case of Puczynski. Rel. Exh. 19 at 0336 (Govt. Vol. IV, Exh 12) and 0224 (Govt. Vol. III, Exh. 19). Przybyla's identification is extremely weak and does nothing to help resolve the question of whether Slowik was lying about the solicitation, perhaps in the hope that he might, if he admitted some knowledge, have then been able to negotiate a deal like the twelve year sentence Zirajewski got for a brutal murder. Slawomir Trella, for his part, testified that a photo of Mr. Mazur was of a man he had seen with Skotarczak in either Warsaw or Gdansk in 1997. Rel. Exh. 19 at 0241 (Govt. Vol. III, Exh. 25). However, he also stated explicitly that he had seen the man in the photo in television coverage of the all-points bulletin regarding Mr. Mazur's arrest--evidence of the way in which the media coverage shaped the testimony, not of Mr. Mazur's guilt. Rel. Exh. 19 at 0241 (Govt. Vol. III, Exh. 25).

As for Puczynski, his testimony evolved over many interviews without ever doing more to link Mr. Mazur to the murder than to suggest that he had seen Mr. Mazur with Kanigowski and that Kanigowski had implausibly gone out of his way to implicate himself in Gen. Papala's murder. Puczynski testified to driving around with Kanigowski and apparently looking for certain cars. Rel. Exh. 19 at 0222 (Govt. Vol. III, Exh. 19). The Government describes this as establishing that Mr. Mazur had Gen. Papala under surveillance, Tr. at 215:3 ("There, in fact, is surveillance of Mazur."), but Puczynski never testified that this surveillance, even if it was surveillance of Gen. Papala, had any connection to Mr. Mazur. Likewise, Puczynski testified to dumping a package containing gun cartridges in the Vistula River for Kanigowski and that Kanigowski said the package contained "Papala's things." Rel. Exh. 19 at 0224 (Govt. Vol. III,

Exh. 19). This testimony is remarkable partly because Bieszynski stated that when the prosecutors told him they would soon have the murder weapon, he predicted that they would then say that it was thrown in a body of water-- precisely predicting what became Puczynski's testimony. Tr. at 64:14-65:11 (offer of proof). Even if Puczynski's testimony were completely truthful, it would not establish probable cause to extradite Mr. Mazur. Perhaps it would provide probable cause to arrest Kanigowski if he had not been shot on September 30, 1998, Rel. Exh. at 0371 (Govt. Vol. IV, Exh. 16), but the testimony that Kanigowski met with Mr. Mazur "once or twice," Rel. Exh. at 0226 (Govt. Vol. III, Exh. 20), cannot be sufficient to make Mr. Mazur responsible for actions that Puczynski testified Kanigowski took. And again, as with all of the government's witnesses, there is no reason to believe any of his testimony.

That leaves only Zygmunt Rasniak. Rasniak could not testify to anything directly, but testified that Slowik told him about a meeting with Mr. Mazur in which Mr. Mazur sought a hitman to kill Gen. Papala. Rel. Exh. 19 at 0254 (Govt. Vol. IV, Exh. 1). But only two weeks later, Rasniak admitted that he made those statements because he knew that it would be difficult to bring Mr. Mazur to Poland--implying that, like the Polish prosecutors, he was latching onto a patsy who could be safely accused without worrying about the truth inconveniently contradicting their story. Rel. Exh. 19 at 0257 (Govt. Vol. IV, Exh. 2). Moreover, the Government's presentation provides absolutely no information about who Rasniak is, why Slowik might have spoken with him about a contract killing, or (most crucially) whether he had a reason to lie to implicate Mr. Mazur and please the prosecutors.

By far the most likely explanation of the varied, contradictory, and ever-changing testimony presented in support of the extradition is that the Polish prosecutors sought to frame Mr. Mazur. It explains the gradual evolution of statements to implicate Mr. Mazur. It explains

the enormous inconsistencies between the witnesses.  It explains the otherwise peculiar efforts to prevent Col. Bieszynski from having any access to the witnesses they had carefully controlled, for fear that he would uncover and reveal their misfeasance.  It explains the farcically suggestive line-up.  It even explains the failure to contextualize witness statements, with only excerpts from the witness statements and some relevant statements entirely omitted.

## IV.    This Court Should Deny Extradition.

The Republic of Poland is counting on this Court acting as a rubber stamp, accepting any statement that on its face implicates a United States citizen as sufficient to justify extradition. That assumption is, of course, false.   This Court is duty-bound to apply a meaningful probable cause standard.  Applying such a standard, the Court would not hesitate to deny a warrant based on this mishmash of contradictory and inherently unreliable evidence. It is a bizarre irony that, on evidence that could not support a domestic arrest or search warrant, this Court is being asked to allow a United States citizen to be wrongfully shipped off for trial in a foreign country that has already demonstrated its willingness to distort the truth in order to convict him.

The Government gave a carefully crafted account in its closing of how all of the testimony could be consistent with Mr. Mazur's involvement.  But that is not the relevant question.  The issue is not whether the Government can somehow tell a story of the relator's guilt through guesswork, conjecture and hypothesis.  For example, the Government implied in its closing that Mr. Mazur met two organized crime figures in Austria in mid-May of 1998 to plan Gen. Papala's murder.  Tr. 231 at 2-6.  But the Government has no evidence that such a meeting ever took place.  In fact, the only description of a meeting in Austria actually in evidence did not include Mr. Mazur at all.  Rel. Exh. 19 at 0230 (Govt. Vol. III, Exh. 21).  As with so many of the Government's assertions, the Austria meeting is an example of innuendo and hypothesis, devoid

20

of actual evidence. This Court must determine whether the evidence--not the Government's interpretation, not its rhetoric, but the actual evidence before the Court--establishes probable cause. Because the Government's evidence is contradictory, often irrelevant, and relies entirely on the testimony of criminals and liars with more incentive to give the prosecutors what they wanted instead of to tell the truth, probable cause does not exist in this case. No verbal flourishes by the Government can change that fact.

The Government's submission does not establish probable cause to believe that Mr. Mazur committed the offense for which Poland seeks his extradition. This Court should deny the extradition request and order Mr. Mazur's release.

Dated: June 22, 2007                                Respectfully submitted,
        Chicago, Illinois
                                                    EDWARD MAZUR


                                                    By:    _s/ Chris C. Gair_____
                                                            One of his Attorneys
Chris C. Gair
Adam H. Morse
JENNER & BLOCK LLP
330 N. Wabash Avenue
Chicago, IL 60611
Telephone: 312 222-9350
Facsimile: 312 923-8439

## <u>CERTIFICATE OF SERVICE</u>

Chris Gair, an attorney, hereby certifies that on June 22, 2007, he caused a copy of the ***Edward Mazur's Post-Hearing Memorandum*** to be served upon counsel listed below, via the Court's ECF system.

Mitchell A. Mars
Assistant United States Attorney
219 S. Dearborn St., 5th Floor
Chicago, IL 60604
mitchell.mars@usdoj.gov

*__s/ Chris C. Gair___*
Chris C. Gair