IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

IN THE MATTER OF THE EXTRADITION   )
                                   )   No. 06 M 295
     OF                            )
                                   )   Magistrate Judge
EDWARD MAZUR                       )   Arlander Keys

## MEMORANDUM OPINION AND ORDER

The United States Department of Justice, on behalf of the
Republic of Poland, seeks the extradition of an American citizen,
Edward Mazur, to face charges in Poland that he incited the
murder of the country's top law enforcement official, Marek
Papala, who was gunned down in June 1998. After painstakingly
reviewing and considering the documents and materials submitted
by the government, via the State Department, and after
considering the evidence introduced by Mr. Mazur and by the
government at the hearing in this matter, as well as the well-
crafted oral and written arguments of counsel on both sides of
the issue, the Court finds that the government's evidence falls
short of establishing probable cause to believe that Mr. Mazur
committed the crime charged.

## BACKGROUND & PROCEDURAL HISTORY

### A.   The Extradition Process

The extradition process is governed by the provisions of the
federal extradition statute, and by the relevant treaty – in this
case, the Extradition Treaty between the United States and the

Republic of Poland. Both require the country seeking extradition - the "Requesting State" - to submit a request "through proper diplomatic channels." 18 U.S.C. §3181 et seq.; Extradition Treaty, Article 9, paragraph 1. The request must "be supported by sufficient evidence to show that the individual is the person sought for the crimes charged, that the crimes are among those listed as extraditable offenses in the Treaty and that there is sufficient justification for the individual's arrest had the charged crime been committed in the United States." *Eain v. Wilkes*, 641 F.2d 504, 508 (7th Cir. 1981). Specifically, the Extradition Treaty with Poland requires the Requesting State to submit: documents, statements, or other types of information which describe the identity, nationality, and probable location of the person sought; information describing the facts of the offense and the procedural history of the case; the text of the law describing the essential elements of the offense for which extradition is requested; the text of the law prescribing the punishment for the offense; a statement of the provisions of law describing any time limit on the prosecution or enforcement of the penalty for the offense for which extradition has been sought; and a copy of the warrant or order of arrest, if any, issued by a judge or other competent authority, as well as a copy of the charging document, if any. Extradition Treaty, Article 9, ¶¶2-3.

If the State Department approves the request, the papers are then forwarded to the U.S. Attorney's office in the district where the person sought ("the Relator") may be found; the U.S. Attorney may then file a complaint and seek an arrest warrant from a magistrate judge. If a warrant issues, the magistrate judge then conducts a hearing to determine whether there is sufficient evidence to sustain the charge under the provisions of the treaty. *Id.*

An extradition court exercises very limited authority in the overall process of extradition; "[e]xtradition is a matter of foreign policy entirely within the discretion of the executive branch, except to the extent that the statute interposes a judicial function." *Lopez-Smith v. Hood,* 121 F.3d 1322, 1326 (9th Cir. 1997)(citing *In re Metzger,* 46 U.S. (5 How.) 176, 188, 12 L.Ed. 104 (1847)). Under the statute, if, after evaluating the evidence presented, the magistrate judge determines that the offense charged is within the treaty's terms and that probable cause exists to believe that the Relator committed that offense, then he certifies the matter to the Secretary of State, who has sole discretion to determine whether or not the extradition should proceed to fruition. *Eain,* 641 F.2d at 508. If, on the other hand, the magistrate judge determines either that the offense charged is not within the treaty, or that probable cause does not exist, the magistrate judge will so certify. *Id.*

3

**B.    Proceedings in this Court**

On October 19, 2006, the United States Attorney's Office filed a complaint seeking the provisional arrest and extradition of Edward Mazur, a citizen of both the United States and Poland. The complaint charges that,

> [o]n February 1, 2005, the Regional Court for Warsaw Śródmieście, II Criminal Department, Presiding Judge Joanna Zaremba, issued a provisional arrest warrant in the Requesting State for Edward Mazur for the crime of enticing Artur Zirajewski in April 1998, jointly and in conspiracy with another person, to perpetrate the crime of the murder of Chief Superintendent Marek Papala, offering him in return for the perpetration of this crime a sum of forty thousand U.S. dollars, an offense specified in article 18§1 of the Criminal Code of 1969 in connection with article 148§1 of the Criminal Code of 1969.

Complaint, ¶1.

### 1.    The Government's Submission in Support of the Extradition Request

Along with the complaint, the government submitted five volumes of original documents from the State Department.   Volume I consists of the Declaration of Jacob K. Cogan, an Attorney-Adviser in the Office of the Legal Adviser for the Department of State, Washington, D.C., and the person charged with handling Mr. Mazur's extradition case.   *See* Government's Submission, Volume I; Relator's Exhibit 19, pp. 0012-0013.[1]   In his declaration, Mr.

---

[1] Relator's Exhibit 19 is just a copy of the government's five-volume submission with Bates numbers added to each page; for ease of reference, the Court will cite to this exhibit, either in addition to or instead of the original documents, which do not contain Bates numbers.

4

Cogan represents that the offense for which extradition is sought is covered under Article 2 of the Extradition Treaty between the United States of America and Poland signed on July 10, 1996 and entered into force on September 17, 1999; he attaches copies of the Treaty, along with copies of Diplomatic Note No. 35-9-05, dated April 4, 2005, which formally requested Mr. Mazur's extradition. *See* Volume I; Relator's Exhibit 19, p. 0013.

The Treaty provides, at Article 2, as follows:

> 1. An offense shall be an extraditable offense if it is punishable under the laws in both Contracting States by deprivation of liberty for a maximum period of more than one year or by a more severe penalty.

> 2. An offense shall also be an extraditable offense if it consists of an attempt to commit, or participation in the commission of, an offense described in paragraph 1 of this Article. Any type of association to commit offenses described in paragraph 1 of this Article, as provided by the laws of Poland, and conspiracy to commit an offense described in paragraph 1 of this Article, as provided by the laws of the United States, shall also be extraditable offenses.

*See* Extradition Treaty Between the United States of America and the Republic of Poland, July 10, 1996, Art. 2, ¶¶ 1-2 (attached as Government Exhibit 2(I)[2]; Relator's Exhibit 19, pp. 0026-0027).

Diplomatic Note No. 35-9-05 states that Mr. Mazur, who was born on October 25, 1946 in Poland, is

---

[2]The government numbered its exhibits such that each volume starts anew with exhibit 1; to make things clear, when citing to the government's exhibits, the Court will note the volume number in parentheses after the exhibit number.

suspected of the crime of instigation to murder, which
was committed in Poland. This crime is specified in
article 18, paragraph 1 in connection with article 148,
paragraph 1 of the Penal Code.

The offense Mr. Edward Mazur is suspected of
corresponds with this described in the article 2 of the
Treaty of Extradition between the Republic of Poland
and the United States of America.

*See* Government's Exhibit 1(I); Relator's Exhibit 19, p. 0014.

Article 18, paragraph 1 of the Polish Criminal Code, which

is attached, in Volume II, to a certified translation of a letter

from Andrzej Kępiński, Head of the Department of International

Legal Affairs at the Ministry of Justice, states that "[a]ny

person who, wishing another to commit a prohibited act, induces

him/her to do so, is liable for incitement." Government's

Exhibit 3(II); Relator's Exhibit 19, p. 0049. The regulations

submitted by the government indicate that the principal penalties

for the crime of "incitement" are "imprisonment," "limitation of

liberty" and "fine," though they do not specify what term of

imprisonment may be imposed. *See* Exhibit 3(II); Relator's

Exhibit pp. 0049-0050.

Volume III of the government's submission consists of the

formal request for provisional arrest and extradition, extracts

from interviews of witnesses, the decision on provisional arrest

issued by the Regional Court in Warsaw, the all-points bulletin

and other related records to support the extradition request.

The documents were certified by Lisa Piascik, the Consul General

6

of the United States in Warsaw, on March 31, 2005.

In the Request for provisional arrest and extradition, dated March 25, 2005, the appellate prosecutor's office in Warsaw stated, in support of the request, that:

> in April 1998 in Gdańsk, jointly and in conspiracy with another, [Mr. Mazur] induced Artur Zirajewski to commit a crime of murder of chief superintendent Marek Papala, offering him in return for perpetration of this offense the amount of 40,000 American dollars, that is an offense under article 18 paragraph 1 in connection with article 148 paragraph 1 of the Criminal Code of 1969.

*See* Government Exhibit 2(III); Relator's Exhibit 19, p. 0163. The request also includes a summary of the evidence collected in the course of the investigation. In particular, the letter states that, according to Artur Zirajewski, Mr. Mazur met Mr. Zirajewski, Nikodem Skotarczak and Andrzej Zieliński (a.k.a. Slowik) in April 1998 in Gdańsk; at that meeting, Mr. Mazur showed Mr. Zirajewski a photograph of Marek Papala and offered $40,000 U.S. for his murder. *See* Relator's Exhibit 19, p. 0164. The letter also indicates that Mr. Zirajewski "was arrested on April 29, 1998, on charges of having perpetrated other offenses, and has since been in investigative custody." *See* Relator's Exhibit 19, p. 0165.

The request letter also details that an anonymous informer tipped the police that Rafal Kanigowski and Marcin Puczyński could have been involved in General Papala's murder; Mr. Kanigowski was murdered in September 1998, but Mr. Puczyński,

7

when interviewed, testified that, on instructions from Mr. Kanigowski, he drove Mr. Kanigowski many times during the months of May and June 1998 in the region of General Papala's house, where Mr. Kanigowski was supposedly looking for two Daewoo Espero cars – one green and one red; such cars were at General Papala's disposal. *See* Relator's Exhibit 19, p. 0165. Mr. Puczyński also identified Mr. Mazur as someone with whom Mr. Kanigowski had contacts. *Id.*

Finally, the request states that, "[o]n February 1, 2005, the Regional Court for the Capital City of Warsaw issued a resolution under file reference number II Kp 212/05 on provisional arrest of Edward Mazur for a period of 14 days from the date of apprehension," and that "[t]he Appellate Prosecutor's office in Warsaw on February 2, 2005 put out an all-points bulletin on Edward Mazur." *See* Relator's Exhibit 19, p. 0166.

Volume III also includes extracts from records of interviews of Artur Zirajewski, Andrzej Zieliński, and Marcin Puczyński. The record includes fourteen statements from Mr. Zirajewski; the following summarizes each, as it relates to Mr. Mazur and the murder of General Papala.

### The April 10, 1999 Statement:

In this statement, Mr. Zirajewski indicated that he "possess[es] information that may clarify the death of General Papala. He stated that, in March or April 1998, he went to

Gdańsk with Tomek Nowosad, who had an appointment; after talking with the man he was meeting, Mr. Nowosad told Mr. Zirajewski that he "accepted a good contract for some 'big dog' from the capital," which Mr. Zirajewski took to mean that he was going to kill a police officer. Exhibit 19, p. 0172. Mr. Zirajewski stated that, several days later, he met with Nikodem Skotarczak at the Marina Hotel; he stated that a total of 6 people attended the meeting: Mr. Skotarczak, Mr. Tomek, Mr. Zirajewski and three men unknown to him; he said nothing about Mr. Mazur. He stated that Tomek and the men unknown to Mr. Zirajewski talked about getting "rid of this dog as soon as possible." *Id.* Mr. Zirajewski stated that, several days later, he met Sergey and Sergey told him that Tomek had "proposed him 'to do some policeman' and then he specified his rank as 'general'"; Mr. Zirajewski stated that, at Tomek's request, he agreed to handle the financial matters; according to Mr. Zirajewski, Tomek offered 40 thousand dollars for the job, to be paid in two installments, half before the killing and half after the killing. *Id.* He stated that Tomek agreed to provide the weapon for the job and that he would give Sergey a "guide" who would indicate the target. *Id.*, p. 0173. He stated that he was arrested on April 29, 1998. *Id.*

### The August 19, 1999 Statement:

In this statement. Mr. Zirajewski described an April 1998

9

meeting that he attended with "Nikodem" at the Marina hotel. *See*
Government's Exhibit 15(III); Relator's Exhibit 19, p. 0211-0214.
Mr. Zirajewski stated that the meeting included two other men,
who Nikodem told him in advance would be called Slowik and Edward
Mazur; he was unable to describe their appearances, but said he
thought he could recognize them. *Id.*, p. 0213. Mr. Zirajewski
stated that they did not discuss details at this time, but
generally talked about a contract for killing a policeman; he
stated that he and Nikodem had previously discussed the price
they would demand for the job - $40,000, which, according to Mr.
Zirajewski, Nikodem suggested he request after the killing was
done, to make them seem more credible. *Id.*, p. 0212. According
to Mr. Zirajewski, the idea was that he would find a hitman and
that the job would be done in Warsaw. *Id.* He stated that, at
one point, one of the men told him they had General Papala under
surveillance and then made a telephone call and asked "where is
our man" to gain credibility; after the phone call, the man
reported that General Papala was at that moment at some club
called "Lotis" or "Latis." *Id.* Mr. Zirajewski stated that he
"chose Sergey as the hitman for the job," but did not give him
any details at that time. *Id.*, p. 0213. He also stated that,
although the Marina meeting was the first time he saw Slowik, he
had seen "Edek" before; he stated that he accompanied Nikodem to
a meeting in Warsaw, at a residential project in the Wilanów

10

district, where Nikodem met with two men, Edek and Jacek, in a parking lot; he stated that he did not participate in the conversation and does not know what the meeting was about. *Id.*, p. 0213.

### The September 9, 1999 Statement:

During this interview, Mr. Zirajewski apparently talked about two meetings at the Marina Hotel, wherein those present talked about killing a police officer in Warsaw. The first meeting included Mr. Zirajewski, Nikoderm Skotarczak, a man known as "Kartofel" and another man; Mr. Mazur was not present. At that time, Mr. Zirajewski agreed to help find a hitman, though he did not yet know the target of the murder. At the second meeting, which included a man called Slowik and Mr. Mazur, Mr. Zirajewski was shown pictures of General Papala, who was identified as the target. Mr. Zirajewski stated that he contacted "Sergey," who agreed to act as the hitman, though he never told Sergey who the target was; he stated that he waited for a signal from Nikoderm Skotarczak, but that it never came because Mr. Skotarczak was shot and he (Mr. Zirajewski) was arrested.

### The May 30, 2001 Statement:

In this statement, Mr. Zirajewski stated that there was a meeting at the Marina in February or March 1998; he came at the request of Nikoś and, upon arrival, joined Nikoś at a table where

11

he was sitting with two other men, whom Mr. Zirajewski had never met and never seen before; they were introduced as "Kartofel" and "Bako." *Id.*, p. 0216. Mr. Zirajewski stated that there was no talk about General Papala at the meeting, though he said that, after the meeting, Nikós told him there would be a contract for a hit in Warsaw. *Id.* Mr. Zirajewski stated that, some time later, there was another meeting at the Marina; it was attended by Nikoś, Zirajewski and two men unknown to him; he was introduced to them, but he does not recall their names. *Id.*, p. 0216. There was no talk about General Papala at this second meeting; rather, the men discussed "the Nikós-Slowik conflict" and the issue of "'imposing a charge' on a pseudo-businessman who wanted to defraud people from a befriended firm." *Id.* Mr. Zirajewski stated that, after he was already detained, he heard about General Papala's murder on television and "recalled that I had heard that name during the conversation at the Marina. I do not recall who said that name, but I did realize who it was and what was his function." *Id.*, p. 0216. He stated that he "never heard this name in a context of a contract for killing this person. On the basis of my own considerations I built such a hypothesis. I put together overheard fragments of various conversations and passed it in this way in the form of testimony. Today I gave bare facts, without my commentary or conclusions." *Id.*

## The February 27, 2002 **Statement & Identification:**

In the statement given on this date, Mr. Zirajewski stated that, some time in early 1998, before April 8, he participated in three meetings relating to the murder of General Papala. He stated that, in the first, Tomek met with a man he did not know; the second meeting occurred within several days and was with Nikodem, who told Mr. Zirajewski that there was going to be a meeting at the Marina Hotel in which they would discuss "doing of a head" in Warsaw. Mr. Zirajewski stated that Nikodem wanted to use his (Mr. Zirajewski's) men for the job. The third meeting occurred at the Marina Hotel and included Mr. Zirajewski, Nikodem, Kartofel, a man Mr. Zirajewski recognized but could not name, Ryszard Bogucki and another man Mr. Zirajewski did not know. *Id.*, 0175. At that last meeting, they generally discussed "killing a 'dog,'" but they did not discuss any details. Mr. Zirajewski stated that subsequent talks took place several days later, and that he told Sergey that there would be a "head" to do in Warsaw - a high ranking police officer - and Sergey agreed to do it. *Id.*, p. 0176. Mr. Zirajewski stated that, before the Marina Hotel meeting, Nikodem told him that they would be joined there by "'Slowik' from Warsaw and a businessman named Mazur of first name Ryszard or Edward." *Id.*, p. 0176. Mr. Zirajewski stated that, at the meeting, Mr. Mazur did most of the talking and discussed killing General Papala; according to Mr.

13

Zirajewski, General Papala was to be killed because he "failed to perform on something, that they had some common business, he said it was about smuggling . . . he said General Papala was a big obstacle to further business." *Id.*, p. 0176. According to Mr. Zirajewski, Mr. Mazur said he had General Papala under control and then made a phone call to confirm this; after the phone call, Mr. Mazur said that General Papala "was currently at some club named 'Lotos' or something like that." Mr. Zirajewski stated that they discussed details about the where, when and how of the hit; he stated that the hitman was to await a signal from Nikodem or Nikoś. *Id.*, p. 0177. He also stated that he once accompanied Nikodem to a meeting with Slowik at the Marriott Hotel in Warsaw and then went to Wilanów, where Mr. Zirajewski saw Nikodem meet with Mr. Mazur and two men Mr. Zirajewski did not know; he stated that he did not participate in the conversation but did overhear some snippets about smuggling narcotics. Id., p. 0177. Finally, in this statement, Mr. Zirajewski explained that he did not give complete answers in earlier statements because he was afraid it would jeopardize his family's safety; he stated that he had "been informed by the prosecutor of the conditions of application with respect to me of extraordinary mitigation of penalty." *Id.*, p. 0178.

Also on February 27, 2002, Mr. Zirajewski viewed a line-up of four men, and stated that "[a]mong the four men presented to

me, I recognize the man with number 3 – it is Mazur, mentioned by
me in the record of today's interview. It is the man that I saw
at the Marina – that is at the meeting at the Marina hotel in
Gdańsk, and later at the m3eeting [sic] at a parking lot in
Warsaw. I am certain that it is this man." Government's Exhibit
10(III); Relator's Exhibit 19, p. 0196.[3]

## The April 9, 2002 Statement & Identification:

At this time, Mr. Zirajewski stated that he had nothing to
add to his February 27, 2002 statement. *See* Government's Exhibit
6(III); Relator's Exhibit 19, p. 0179-0181. He was presented
with a line up of four men, one of whom was Jacek Sasin, and
stated that he was "unable to recognize the man that I saw during
the meeting at the parking lot in Wilanów, mentioned in my
testimonies of February 27, 2002. It seems to me that the man
with number 3 may be the man named Jacek, of whom I testified."
Government's Exhibit 11(III); Relator's Exhibit 19, p. 0199.

## The April 26, 2002 Identification:

At this time, Mr. Zirajewski was presented with a line-up of
four men, and he stated that he "recognize[d] the man with number
3 – it is the man who together with Kartofel was presented at the
meeting with me and Nikodem Skotarczak at the Marina hotel.
During this meeting I was asked if would someone who would kill a

---

[3]The photographs documenting this line-up were introduced
for the first time at the extradition hearing on May 23, 2007.
The Court will discuss them below.

'Big Dog' from Warsaw. It is also said that details would be given later, because not all of those interested were present. During that meeting no details were given concerning the target. The man I recognized today also participated in the conversation, but I am unable to recall what he specifically said." Government's Exhibit 12(III); Relator's Exhibit 19, p. 0202. The record of presentation indicates that person number 3 was Jacek Haron. *Id.*, p. 0201.

### The January 7, 2003 Statement:

Here, Mr. Zirajewski stated that he had "decided to tell all I know, as I decided that when I tell everything I know, my situation would improve on the case that is currently heard before the District Court in Gdańsk, I had been earlier advised by interviewer in the case that the Criminal Code in article 60 paragraph 4 provides for a possibility of mitigation of penalty in a situation when one reveals material circumstances of another case." Government's Exhibit 7(III); Relator's Exhibit 19, p. 0183. He stated that, more or less from 1997, he worked with Nikodem Skotarczak "conducting common criminal activity"; when Nikodem wanted to use Mr. Zirajewski's men to perpetrate a crime, including homicide, he would go through Mr. Zirajewski. *Id.*, p. 0183. He stated that he first heard about the contract for killing a police officer from Tomek Nowosad; he stated that he attended two meetings at the Marina Hotel, Mr. Mazur was not

present at the first, but was present at the second. Mr. Zirajewski stated that he had contact with Mr. Mazur twice, once at the Marina Hotel meeting and once in Wilanów, though they did not talk to each other then. *Id.*, p. 0183-0184. He states that he is unable to recall whether it was Slowik or Mr. Mazur who placed the telephone call to show that they had General Papala under surveillance, but that he believed it was Mr. Mazur. *Id.*, p. 0184. He stated that, at least twice, he heard Nikodem refer to Mr. Mazur as "Bako" and that he was "entirely positive that the man addressed by Nikodem as 'Bako' and Mazur [were] one and the same person." *Id.*

### The May 16, 2003 Statement:

During the interview on this date, Mr. Zirajewski was shown "film material recorded on a CD marked MW-2-W, containing recordings made at three locations in Warsaw, that is Kiersnowskiego, Etiudy Rewolucyjnej and Ceglowska streets." Government's Exhibit 8(III); Relator's Exhibit 19, p. 0189. Mr. Zirajewski stated that the names of these streets "mean nothing to him." *Id.* Yet, after reviewing the film, he stated that the second recording (Etiudy Rewolucyjnej) "brings to mind the place where the Sasins met with Nikodem Skotarczak and Mazur." *Id.*, p. 0190. On this same date, Mr. Zirajewski was presented with a line-up of four persons, one of whom (person number 2) was Andrzej Zieliński; he stated:

> I recognize with absolute certainty the man with number
> 2. It is "Slowik". I saw him during the second
> meeting at the Marina hotel in Gdańsk. He was in the
> company of Nikodem Skotarczak and Mazur. I have
> already testified about this meeting in detail. I
> think that during that meeting Slowik had shorter hair,
> now he has them more upright. I recognize him by
> facial features. I saw a photograph of Slowik in the
> papers but I have never, aside from that meeting at the
> Marina, seen him "live."

Government's Exhibit 13(III); Relator's Exhibit 19, p. 0205.

### The June 3, 2003 Statement:

During the interview on this date, Mr. Zirajewski was again shown "film material recorded on a CD marked MW-03 containing recordings made at two locations in Warsaw, Etiudy Rewolucyjnej and Osiedle Wilanów. In response, he stated that the names of the mentioned streets "mean nothing to him" and he is "unable to recognize the places I visited in Warsaw." Government's Exhibit 9(III); Relator's Exhibit 19, p. 0193.

Volume III also includes an April 6, 2004 "Record of a Confrontation" with Zirajewski. Apparently, the assistant inspector of the General Police Headquarters and the chief commissioner of the General Police Headquarters, decided "to conduct a procedural experiment aimed at establishment whether the locations selected in the course of conduct investigative actions are the places where according to the description of witness Artur Zirajewski he met with Edward Mazur, Józef Sasin, Jacek Sasin, Nikodem Skotarczak and Jakub Krawczyk."

18

Government's Exhibit 14(III); Relator's Exhibit 19, p. 0207.
While driving on Podczaszyńskiego street, Zirajewski pointed out
a place where he met with Nikodem Skotarczak, Józef Sasin, Jacek
Sasin, Edward Mazur, and one other person he did not know; he
stated that their meeting took place while standing next to some
parked cars. See Government's Exhibit 14(III); Relator's Exhibit
19, pp. 0207-0208.

There is also a July 26, 2004 "Record of Confrontation"
involving Messrs. Zirajewski and Zieliński. Despite Mr.
Zirajewski's May 16, 2003 statement concerning Mr. Zieliński's
presence at the Marina hotel meeting with Nikodem Skotarczak and
Mr. Mazur, Mr. Zieliński stated that he did not know Mr.
Zirajewski and did not recall meeting him, that he did not know
Edward Mazur, and that he knew Nikodem Skotarczak, but did not
recall "any other meeting with him at the Marina hotel apart from
the one he described during my interview [of June 16, 2004]."
Government's Exhibit 17(III); Relator's Exhibit 19, p. 0218-0219.
The record of Mr. Zieliński's June 16, 2004 interview, along with
the records of his other statements, appear in Volume IV of the
Government's submission and will be discussed below.

Also included in Volume III are extracts from six statements
taken from Marcin Puczyński during the period ranging from June
2004 to March 2005. In his first statement, dated June 15, 2004,
Mr. Puczyński stated that he worked for "Perfekt Taxi," a cab

company owned and operated by Rafal Kanigowski; he stated that he also served as Mr. Kanigowski's personal driver in Warsaw. *See* Government's Exhibit 18(III); Relator's Exhibit 19, p. 0220. He stated that, in mid-1998, Mr. Kanigowski would have him deviate from the route he would normally drive to get to the intended destination; he did not know why he was asked to take this circuitous route. *Id.*, p. 0221. He also stated that he learned of General Papala's murder from the media and that "from the description that was given there I gathered that the assassination took place [in] the area where we were driving. *Id.*

In his next statement, obtained on August 9, 2004, Mr. Puczyński stated that Mr. Kanigowski initially did not tell him why he was having him drive him around this area, but later told him they were looking for "two Espero cars, a green one and red one; I did not ask him about and did not ask him why he was looking for those cars." Government's Exhibit 19(III); Relator's Exhibit 19, p. 0222. Mr. Puczyński stated that he was in the office of Perfekt Taxi several days after General Papala's murder, when Mr. Kanigowski told him that he "would get a package from him, and that I was to dump it immediately into the Vistula river." *Id.*, p. 0223. He stated that, after some time, Mr. Kanigowski left the office and returned with a package; it was "larger than my hand, it was difficult to grab, and had irregular

shape. I do not know what was inside, because the package was wrapped in several layers of black foil and sealed with adhesive tape. It was rather heavy, and when I touched the package I gathered it contained ammunition." *Id.*, p. 0224. Mr. Puczyński stated that Mr. Kanigowski

> told me to take the package and dump it into the
> Vistula river. He told me to do it immediately but did
> not indicate a specific place where I was to do it. I
> then went in my Polonez car to the Gdański Bridge area.
> I stopped the car there and walked down to the river.
> When I was about to throw the package into the water,
> suddenly a police motorboat emerged from the bushes. I
> then took off my shirt, placed the package under my
> head and pretended I was sunbathing. When the
> motorboat left I returned to the car to go someplace
> else. Then Kanigowski began calling me, he was
> panicked, he asked if I had already dumped the package.
> When I said not yet, he began shouting that I was not
> to get caught by the police with that package, that I
> was to run away in case of emergency and I was to get
> rid of it immediately. . . . I then drove to the other
> side of the Vistula by the canal near the river police
> station, and dumped the package there. . . . When I
> returned to the office Kanigowski yelled at me, he said
> there Papala's things in the package [sic] and that is
> why he was so anxious.

*Id.*, p. 0224.

Less than two weeks later, on August 20, 2004, Mr. Puczyński gave another statement; this time, he stated that he recalled driving Mr. Kanigowski to a meeting at the Karat hotel in Warsaw in 1998; he could not recall the date, but remembered that it was warm. *See* Government's Exhibit 20(III); Relator's Exhibit 19, p. 0226-0227. He stated that Mr. Kanigowski met with a man who was waiting for him at a table when they arrived; the man was "neatly

dressed in a suit" and "maintained a high standard of manners";
from what Mr. Kanigowski said, Mr. Puczyński concluded that the
man was "somehow connected with the United States." *Id.*, p.
0227. About a month later, on September 15, 2004, Mr. Puczyński
supplemented his testimony. He stated that in May and June 1998,
Mr. Kanigowski "operated very intensely and settled many affairs
at once." Government's Exhibit 21(III); Relator's Exhibit 19, p.
0229. He stated that Mr. Kanigowski "began to meet many people,
whom I had not seen before. Among other things, I mean that man
at the Karat hotel that I testified about earlier. I recalled
that I saw another meeting between them at the Maria hotel on
Jana Pawła II." *Id.*, p. 0230. Mr. Puczyński stated that "Rafal
was sitting at a table far from me with the man I saw at the
Karat hotel. . . . They were reviewing some papers, I do not know
what papers they were, because I was too far and I also did not
hear any fragments of conversation." *Id.*

The record contains extracts from two additional statements
from Mr. Puczyński. On January 26, 2005, Mr. Puczyński related a
story about how Mr. Kanigowski had gone to Germany and blown up a
car for "Tata"; he also stated that, shortly after his return
from Germany, Mr. Kanigowski

> began to have many various meetings with persons, who I
> had never seen before. . . . One of such persons that
> Rafal began meeting shortly after his return from
> Germany was the man I had indicated on the photographs,
> with whom Rafal met at the Karat hotel, Maria hotel and
> perhaps at the Marriott. . . . After one of the

22

> meetings with man, Rafal told me it was a businessman
> from America or American.

Government's Exhibit 22(III); Relator's Exhibit 19, p. 0233.    On

March 14, 2005, Mr. Puczyński stated that, after seeing an "all-

points bulleting on Edward Mazur, and after seeing Mr. Mazur

interviewed on a television program, "it is for 100% the person I

had seen in the photographs during the interview . . . it is the

same person that Kanigowski used to meet I assessed by both his

overall silhouette, the look of his face and the rather

characteristic in my opinion behavior and movements."

Government's Exhibit 23(III); Relator's Exhibit 19, p. 0235-0236.

The record also contains an extract from a report of an "on-site

inspection in the area of the Horse Racetrack in Warsaw with the

participation of witness Marcin Puczyński." *See* Government's

Exhibit 24(III); Relator's Exhibit 19, p. 0237-0240.    According

to the report, Mr. Puczyński drove around with a police officer,

noting the route Mr. Kanigowski used to have him drive.    *Id.*

    Volume III also includes an extract from a record of a March

21, 2005 interview with Slawomir Trella.    After being shown a

picture of Mr. Mazur from the all-points-bulletin issued in

connection with General Papala's murder, Mr. Trella stated that

he had "certainly seen this man 'live.'" Specifically, he stated:

> It was when Nikoś was still alive. He is quite
> characteristic - well-groomed, elegant, he has specific
> manners and attracts attention, because he does not fit
> our environment. His manners do not even fit "crooked"
> businessman. It is a person from "another fairytale".

He makes an impression of a politician. I certainly saw him in Warsaw at the Marriott, or at the Marina in Gdańsk, but I rather think it was at the Marina. There was someone else at the table with them, but I cannot recall who. Certainly they were in the company of someone from Gdańsk. I was not introduced to him, and I remember him because he was different from all acquaintances of Nikoś.

Government's Exhibit 25(III); Relator's Exhibit 19, p. 0241.

Finally, Volume III includes an extract from a February 1, 2005 Resolution from the Regional Court for Warsaw Śródmieście, II Criminal Department to apply for the provisional arrest of Mr. Mazur. *See* Government's Exhibit 26(III); Relator's Exhibit 19, p. 0243-0244. The resolution states:

[t]he evidence collected in the case, in particular the testimonies of witness Artur Zirajewski, indicates high probability that the suspect Edward Mazur perpetrated the alleged . . . offense under article 18§1 of the Criminal Code of 1969 in connection with article 148§1 of the Criminal Code of 1969, that is an act of a major degree of social harmfulness.

*Id.*, p. 0243. A copy of the All-Points Bulletin for Mr. Mazur, issued on February 2, 2005, is also attached; according to the bulletin, Mr. Mazur is wanted for the "enticement of another person in April 1998 in Gdańsk to perpetrate murder of chief inspector Marek Papala, that is an act under article 18 paragraph 1 of the Criminal Code of 1969 in connection with article 148 paragraph 1 of the Criminal Code of 1969." Government's Exhibit 27(III); Relator's Exhibit 19, p. 0247.

Volume IV of the Government's submission includes additional witness statements. On June 9, 2006, Zygmunt Raźniak stated

24

that, some time in the last days of April 1998, he was drinking vodka in a bar with "Andrzej" (presumably Mr. Zieliński, though he did not specifically say), when Andrzej told him that he had "taken part in a meeting with Mr. Mazur, and that Mazur had been looking for someone to shoot General Papala dead." Government's Exhibit 1(IV); Relator's Exhibit 19, p. 0254. Volume IV also includes a record of a June 23, 2006 confrontation, staged by the prosecutor's office in Warsaw, between Messrs. Zieliński and Raźniak; as reflected in that record, Mr. Raźniak stood by his statement that Mr. Zieliński told him about a meeting with Mr. Mazur, and Mr. Zieliński stood by his statement that he did not know Mr. Mazur and had never met with him. *See* Government's Exhibit 1(IV); Relator's Exhibit 19, p. 0256-0257. At the time, Mr. Raźniak stated that he made the statements he made

> because I was aware of the fact that bringing Mr. Mazur to Poland would be very difficult, and to the best of my knowledge I believe Andrzej Zieliński is not guilty at all in this case. I am convinced that when Mr. Mazur comes to Poland and charges are brought against him, he will totally clear Andrzej Zieliński of the charges by his statements; this is the only way, I believe.

*Id.*, p. 0257.

Volume IV also includes a record of an interrogation of Andrzej Zieliński taken the same date as the confrontation, June 23, 2006. This time, Mr. Zieliński confirmed Mr. Raźniak's account, and confirmed that he had told Mr. Raźniak about a meeting he had with Nikodem Skotarczak and Edward Mazur where

"the order to kill Marek Papala had been mentioned."
Government's Exhibit 3(IV); Relator's Exhibit 19, p. 0260. Mr.
Zieliński stated that he was instructed by Zbigniew Barszcz
(a.k.a Kajtek) to meet with "Marzec and Mazur" about securing an
early release from prison for his friend Andrzej Kolikowski
(a.k.a. Pershing); he stated that, later that same day, he
received a call from Kajtek telling him to go to the Marina hotel
in Gdańsk, "where Marzec or Mazur and Nikoś would be." Id., p.
0260. Mr. Zieliński stated that, when he arrived at the hotel,
Nikoś was already there, sitting at a table with another man,
whom he introduced as Mr. Mazur; according to Mr. Zieliński,
Nikoś said Mr. Mazur "could help Pershing." Id., p. 0261. He
stated "[a]t some moment, Mazur asked me whether I knew someone
who could accept an order for killing Papala. I am certain Mazur
mentioned the name." Id., p. 0261. Mr. Zieliński stated that he
told Mr. Mazur he "was not interested at all, I was only
interested in earlier release of Pershing." Id. He stated that
Mr. Mazur "is the same man whose pictures I saw later on TV and
in newspapers." Id. When asked whether Mr. Zirajewski was
present at the meeting, Mr. Zieliński stated, "I do not remember
this man, I cannot recognise him." Id.

Volume IV also includes a number of "reports on cross-
examination" of various witnesses, including Messrs. Zieliński,
Puczyński, and Ryszard Przybyla. A June 16, 2004 report from Mr.

Zieliński said nothing about Mr. Mazur or the General Papala murder; an attachment documenting the "undisclosed part of the report" indicated that Mr. Zieliński "confirms his acquaintance with Ryszard Bogucki, but he denies the fact of meeting and having a conversation in Gdańsk, at the Marina Hotel, with Edward Mazur and Artur Zirajewski in April 1998." Government's Exhibit 5(IV); Relator's Exhibit 19, p. 0292.

Volume IV also includes a "report on cross-examination" of Małgorzata Papala, General Papala's widow. She stated that General Papala "did not keep close contacts with Mr. Mazur, he was at our place maybe twice," but that the General had "asked [Mr. Mazur] to organize a language course for him" and that Mr. Mazur had "arranged for him an invitation to the United States for a month's scholarship." Government's Exhibit 13(IV); Relator's Exhibit 19, p. 0342-0343. She stated that, on the night her husband was killed, he told her he was awaiting a phone call from Mr. Mazur; Mr. Mazur did call and, according to her husband, they arranged to meet at Mr. Sasin's house. *Id.*, p. 0343. She stated that her husband left home shortly after 8 p.m. to meet Mr. Mazur. *Id.* She stated that, at 9:50 p.m., she went for a walk with the dog, and that, when she was coming back to the flat, she saw her husband's car between the buildings and the garages, then lost sight of it; she stated that she then "heard a crack which sounded to me like a metal ball hitting glass." *Id.*

She stated that, as she got closer to the car, she saw

> a figure of a thin man, with long legs. He was running
> in the direction from the cars parked in the car park
> to the fire escape path. I think he was dressed in a
> dark, short jacket. This lasted seconds. When the man
> disappeared on the path, at the same time a couple of
> young people emerged from the path. They were walking
> very slowly, holding each other. . . . When I
> approached the parked cars, I went to my husband's car,
> I saw my husband's leg [sticking] out of the car, I
> came closer and I saw that my husband was bent over the
> steering wheel. It seemed to me that he was looking
> for something. I said something to him, but he did not
> reply. I started to shake him and then I saw that my
> husband was bleeding from his nose, then I saw blood on
> his shirt - I tried to save him, I was calling for
> help.

*Id.*, pp. 0343-0345.

Volume IV also includes a number of "official notes," which summarize the criminal careers of some of the individuals mentioned above, people who either gave statements in connection with this case, or who are mentioned in the statements given in this case.

Volume V of the Government's submission consists of certain documents received by the United States Department of Justice from the National Prosecutor's Office in Poland, apparently in response to a request for additional information; the file includes original Polish versions, as well as the English translations. First, the submission includes a July 14, 2005 memorandum from the Appellate Prosecutor's Office in Warsaw summarizing what was known as of that date about the Papala murder. According to the memo,

- General Papala was murdered June 25, 1998, shortly before 10:00 p.m.; he died of a single gunshot wound to the head;

- the bullet was retrieved, but its cartridge case was not, making it difficult if not impossible to identify the weapon used;

- at least three people participated in the murder;

- there were two eyewitnesses to the crime: (1) General Papala's wife, who saw but could not identify the assassin, and who identified Ryszard Bogucki as one of the two people who cooperated with the assassin (the other person was a woman, whom she could not identify); and (2) Nguyen Chi Thien, who saw, but could not identify anyone involved in the crime;

- General Papala left the post of Commander General of the Police in January 1998; from February until the day he died, he studied English at the Laris foreign language school in Warsaw;

- on the night he was killed, General Papala met with Edward Mazur at the home of Józef Sasin, the retired general of the Security Service;

- from Mr. Sasin's house, General Papala was to go to the Central Railway station in Warsaw to pick up his mother; because the train was delayed, he returned home alone and was killed in the parking lot;

- within two hours of the murder, Mr. Mazur was interviewed as a witness; he was interviewed several times during the course

of the murder investigation;

- according to the prosecutor's office, witness testimony established that Mr. Mazur "maintained broad contacts with persons conducting business activity, politicians, diplomats, and also high-ranking officers of former and current intelligence services and the police"; witness testimony also established that he "used to meet with persons belonging to the organized crime group directed by Jeremiasz Barański alias Baranina."  *See* Government's Exhibit 1(V); Relator's Exhibit 19, pp. 0460-0461. Finally, the appellate prosecutor's July 14, 2005 letter notes that Mr. Mazur is not charged with direct participation in the murder of Marek Papala; "the charge pressed against Edward Mazur concerns solely incitement of Artur Zirajewski to commit murder." *Id.*, p. 0462. Also included are copies of reports from the inspections of the car, the murder scene and the body.

## 2.   **Pre-Hearing Proceedings**

After reviewing the Government's five-volume submission, this Court issued a warrant for Mr. Mazur's arrest.  Mr. Mazur was arrested and brought before the Court; he obtained counsel, who immediately asked the Court to hold the equivalent of a detention hearing.  The parties briefed the question of whether Mr. Mazur should be detained or released on bond, and the Court held the requested hearing on November 15, 2006. At that time, Mr. Mazur presented testimony from seven witnesses - his ex-wife,

his current wife, his 19-year-old son, his business partner, two
former co-workers, and the FBI agent who arrested him; counsel
for Mr. Mazur also read a prepared statement from Mr. Mazur
himself.  On November 28, 2006, the Court issued a written
decision, denying Mr. Mazur's request for bail and ordering Mr.
Mazur detained at the Metropolitan Correctional Center pending
the hearing on the merits of the government's extradition
complaint.

Thereafter, counsel for Mr. Mazur moved to dismiss the
complaint; he also filed a motion to compel discovery, a motion
to continue the date set for the extradition hearing, and a
motion seeking the issuance of subpoenas.  The Court allowed the
parties to brief the issues framed in Mr. Mazur's motions, and,
on March 15, 2007, issued a written decision granting, in part,
Mr. Mazur's discovery motions and denying Mr. Mazur's motion to
dismiss the complaint.  The Court set the matter for a hearing on
the merits of the extradition complaint on May 23, 2007 and set a
pre-hearing conference for May 21, 2007.  Mr. Mazur asked the
Court to reconsider its decision on the motion to dismiss and on
the discovery motions, and, after receiving briefs from the
parties, the Court denied that motion.

At the pre-hearing conference on May 21, both sides outlined
the evidence and testimony they intended to offer in support of,
and in opposition to, the petition for extradition.  The

government indicated that it intended to offer the original State Department documents, which it believed more than established the existence of probable cause. Counsel for Mr. Mazur indicated that he intended to call three to five live witnesses: Ryszard Bieszynski, who counsel characterized as a retired colonel in the Polish equivalent of the FBI; Stanislaw Stys, who was employed as Mr. Mazur's driver when Mr. Mazur was in Poland; Michael Mazur, the relator's son; Dennis Cerillo, an IRS agent who counsel sought to have testify as a summary witness; and Michael Dittoe, the attorney within the United States Department of Justice in Washington, D.C. charged with shepherding the extradition request through the process. Counsel also indicated that he intended to offer an affidavit from Mr. Mazur. With respect to each witness, counsel gave a brief summary of the nature of their intended testimony.

The government objected to all of these witnesses, and the Court heard arguments with respect to each. In the end, counsel for Mr. Mazur withdrew Mr. Stys, the Court declined to allow counsel to call Mr. Cerillo or Mr. Dittoe, but ruled that the remaining witnesses would be allowed to testify. The Court cautioned that, although it would err on the side of allowing Mr. Mazur to present his case and to make a record for future proceedings, it intended to disallow any evidence and testimony that fell outside the scope of the Court's mandate.

### 3.    **The Extradition Hearing**

The Court held the extradition hearing, as scheduled, on May 23, 2007. At that time, the government, for its case-in-chief, tendered the five volumes of documents detailed above. Counsel for Mr. Mazur objected, arguing that the bulk of the exhibits were excerpts of documents, not documents, and that they were not properly certified; the Court admitted the documents over Mr. Mazur's objection. In addition to the five volumes, the government tendered three additional exhibits: (1) customs records from Poland showing Mr. Mazur's entries into the country and his exits out of the country during the relevant time period; (2) a copy of Mr. Mazur's United States passport showing travel stamps for the relevant time periods; and (3) customs records from the United States corresponding to the Polish customs records included in the first exhibit. Mr. Mazur objected to only the first exhibit, and all three were admitted.

For his part, Mr. Mazur first offered a signed affidavit stating that he knew General Papala as a social friend, and that he had assisted him in enrolling in an intensive English course at Dominican University in River Forest, Illinois; the class was initially scheduled to begin in late June 1998. *See* Relator's Exhibit 24, ¶¶2-4. An affidavit from Paul Weinstein, Vice President and General Counsel of Berlitz International, Inc., confirms that, in fact, Marek Papala was scheduled to attend an

intensive English language program offered by Berlitz' ESL
Language Center at Dominican University; the course was scheduled
to begin June 29, 1998 and run through July 24, 1998; the records
from Berlitz list Mr. Mazur's address as General Papala's contact
information.   *See* Relator's Exhibit 15, ¶5 & exhibit 15-1.

Mr. Mazur's affidavit states that, on June 25, 1998, he was
attending a party at the home of "retired General Jozef Sasin";
he called General Papala to arrange a meeting to discuss travel
plans for the language course, and General Papala asked if he
could come to the Sasin home; after obtaining permission from Mr.
Sasin, Mr. Mazur agreed, and General Papala arrived shortly
thereafter.   Relator's Exhibit 24, ¶5.  According to the
affidavit, General Papala told Mr. Mazur that he wanted to
postpone his English course and his trip to the United States;
Mr. Mazur called Dominican University to change the dates, and
General Papala left, saying that he had to pick up his family at
the train station.   *Id.*, ¶6.  A couple of hours later, Mr. Mazur
states, he received a phone call from a police officer friend,
telling him that General Papala had been shot; the friend asked
Mr. Mazur to come to the crime scene, where he provided a
statement.   *Id.*, ¶8.  Finally, in his affidavit, Mr. Mazur states
that he had nothing to do with General Papala's murder, that he
does not know and has never met anyone named Artur Zirajewski,
Nikodem Skotarczak, or Andrzej Zieliński, that he has never been

to the Marina Hotel in Gdańsk; he states that he traveled to Warsaw in 2000 to meet with the prosecutor to answer questions in connection with General Papala's murder, and that he again agreed to meet with the prosecutor in January of 2002, but that meeting was cancelled at the prosecutor's request; he states that he returned to Poland on February 24, 2002, that he voluntarily appeared at the prosecutor's office at that time, agreed to stand in a line-up, was held overnight in jail and then released. *Id.*, ¶¶11-13 .

Following the introduction of Mr. Mazur's affidavit, counsel called to the stand Ryszard Bieszynski, who testified with the aid of a Polish interpreter. Mr. Bieszynski testified that he was employed in law enforcement in the Republic of Poland from 1980, until he resigned in 2005; he testified that he began his career as a police officer, then went to work in the investigative division of security forces in Warsaw. *See* Transcript of Proceedings of May 23, 2007, p. 34. Mr. Bieszynski testified that, when communism fell in Poland, persons in law enforcement had to go through a sort of verification process, whereby the new government checked professional qualifications and moral aptitude; he testified that after going through that process he was offered, and accepted, a position in the new Special Civil Services, also known as the UPO, the State Protection Bureau. Transcript, p. 35-36. He testified that his

organization was akin to the United States' Central Intelligence
Agency; his agency conducted investigations in matters involving
"organized crime, but at the higher level of organization,
economic crime aiming at damaging the financial system and
economic system of the country; and in any other case, when the
deciding authorities would consider that even – either because of
the nature of the event or the nature of the crime, the
appropriate unit to be in charge would be Civil – Special Civil
Services." *Id.*, p. 37. Mr. Bieszynski testified that his
organization was reorganized in 2002 and renamed Security of the
Interior Agency, abbreviated ABW. *Id.*, p. 38. He held various
positions within the ABW, from a specialist to, ultimately, the
director of the criminal investigations department. *Id.* Mr.
Bieszynski testified that he resigned in 2005, when he was
indicted by the Regional Prosecutor's Office in Katowice, for
carrying out the order of the Regional Prosecutor's Office in
Warsaw to arrest the president of PKN Orlen, a Polish petroleum
concern. *Id.*, p. 39-40. Mr. Bieszynski testified that he has
never been brought to trial on these charges, which are now two
years old, and that, as far as he knows, nothing is happening in
the case. *Id.*, p. 42.

Mr. Bieszynski testified that he came to the United States
to testify in this case because he believes Mr. Mazur is
innocent; he'd never met Mr. Mazur before, never even spoken with

36

him.  *Id.*, pp. 42-43.  He testified, however, that he did know Marek Papala; they attended the Police Academy together and were good friends.  *Id.*, p. 43-44.  He testified that his agency became involved in the investigation of General Papala's murder in the fall of 1998, a few months after the murder.  *Id.*, p. 45. Mr. Bieszynski testified that his agency conducted interviews of witnesses based upon a list given to them by the Regional Prosecutor's Office in Warsaw.  *Id.*, p. 45.  He testified that, in connection with the investigation, he attended regular meetings with the Director of the Organized Crime Bureau within the Ministry of Justice, as well as the Prosecutor in charge of the case and other members of the police department.  *Id.*, pp. 55-56.  He testified that, despite his participation in these meetings, he had never heard the names Trella, Rasniak, or Przbyla, and that, although Mr. Zirajewski was discussed beginning in about 2001, he never saw any witness statements from him, or from Mr. Zieliński.  *Id.*, pp. 56, 104.  Ultimately, Mr. Bieszynski testified, after everything he reviewed in the case, and after everything he reviewed relating to Mr. Mazur, he could find no evidence of criminal activity – no evidence of any kind of drug activities, no evidence of any organized crime activities, not even a parking ticket.  *Id.*, 72-73.

On cross-examination, Mr. Bieszynski admitted that his department had a limited role in, and was not the main player in,

the Papala murder investigation; that role was filled by the Polish National Police, and the person with overall charge of the investigation was the prosecutor. *Id.*, pp. 84-85, 97. He also admitted that, at present, he stands charged with the crime of abusing his authority in connection with "the Orlen matter" in Poland. *Id.*, p. 102. He also testified that the Orlen matter is, first and foremost, a highly politically charged issue in Poland. *Id.*, pp. 104-105.

After Mr. Bieszynski, counsel for Mr. Mazur offered a stipulation that Mr. Mazur was in the Cayman Islands with his family during the week of April 5 though 12, 1998. Counsel then moved for admission of Relator's Exhibits, and, after considering objections, the Court admitted Relator's Exhibits 1 through 5, and 16 (Mr. Mazur's Polish and United States passports, phone and travel records), 20, 26, and 27 (articles from Polish periodicals, with English translations), in addition to Exhibits 24 and 15, the affidavits discussed above; the Court rejected Relator's Exhibits 10, 11, 12, and 25 (still more articles from newspapers or periodicals), and exhibits 17 and 23, which deal with the general state of the Republic of Poland with regard to civil rights.

In rebuttal to the evidence offered by Mr. Mazur, the government called FBI Special Agent Thad Boertje to the stand. Agent Boertje, who also testified at Mr. Mazur's detention

hearing, testified about his familiarity with the line-up
described by Mr. Mazur in his affidavit of May 20, 2007.  He
testified that, after receiving Mr. Mazur's affidavit, he, along
with the government attorneys involved in the case, called the
United States Embassy in Warsaw to determine whether there was
any photographic representation of that February 27, 2002 line-
up; they learned that there was, and asked the assistant legal
attaché in Warsaw and the Polish prosecutor, to forward such
information.   Transcript, pp. 125-126.  Initially, counsel for
Mr. Mazur objected, arguing that he had been requesting this
evidence for months and that it was unfair and improper for the
government to bring it out during the hearing, when it had
refused for months to provide it; he also objected on
authenticity grounds.   Id., p. 126.  But, after being given some
time to review the photos, Mr. Mazur withdrew his authenticity
objection, and the Court allowed the photographs (there are 5) to
be admitted into evidence as Government's Hearing Exhibit 7.
Briefly, the photos show Mr. Mazur standing and sitting beside
three other men of roughly the same age and complexion as Mr.
Mazur; in the photos it appears that Mr. Mazur is not wearing a
suit, but is instead wearing a dark red fleece-type jacket.

On cross-examination, Agent Boertje admitted that, to be
effective, a physical line-up should include people who are,
overall, similar in appearance, and he admitted that the three

other men depicted in the line-up photos included in Exhibit 7 bore little resemblance to Mr. Mazur. Transcript, pp. 146-148. He also admitted that Mr. Mazur's bright red jacket caused him to stand out in the line-up. *Id.*, p. 150.

The government also introduced Hearing Exhibit 8, which is a copy of a statement given by Mr. Mazur in Poland on February 28, 2002, after the line-up depicted in Exhibit 7 was conducted and before he was released by the Polish authorities. The government represented that it had received the statement from the Polish prosecutor the day before the extradition hearing, and asked the official translator to read it into the record, which the Court allowed. According to that translation, Mr. Mazur, when asked whether he had been in the area of the Tri-City during the period from January 1998 to April of 1998, stated that he was in Poland at various times during that period, and that he had gone once to Gdańsk with his wife and two others (Janusz Pbereszko and Stanislaw Stys) to shop for furniture, but that he was unable to pinpoint the exact timeframe of that trip. Transcript, pp. 154, 156. In response to specific questions, he stated that he had never been to the Marina hotel and did not know Henryk Konopka, Nikodem Skotarczak, Andrzej Zieliński, or Kazimierz Wasiak/Hedberg. *Id.*, pp. 155-157.

Following the presentation of evidence, the parties gave the equivalent of closing arguments. Counsel for Mr. Mazur stressed

the inconsistencies in the various witnesses' statements and the lack of corroboration for anything Mr. Zirajewski said, and he argued that the entire case against Mr. Mazur is contrived from speculation springing from the fact that Mr. Mazur spent time with General Papala the night he was murdered. For its part, the government emphasized that, though the witnesses' statements were inconsistent on certain points, they were overall corroborative of the case laid out by the Polish prosecutor; the government expressed confidence that, upon a thorough review of the documents and evidence in the record, the Court would have no trouble finding probable causes to believe that Mr. Mazur should be held to answer charges in Poland.

## 4.    Post-Hearing Proceedings

Almost a month after the hearing, on June 22, 2007, Mr. Mazur filed a motion seeking leave to file a Post-Hearing Memorandum; the Court granted that motion and *sua sponte* gave the government time to file a brief in response to Mr. Mazur's latest submission.  Mr. Mazur's Post-Hearing Memorandum summarizes, and provides greater detail on, the inconsistencies in the witness statements and the general deficiences he finds in the government's probable cause evidence.  The government filed its brief on July 16, 2007, and this matter is now fully briefed in the truest sense of that phrase - indeed, at the end of the day, no one can say that the parties weren't fully heard on the issues

before the Court, and rightfully so, given all that is at stake.

## ANALYSIS

As explained at the outset, the judicial branch's role in extradition proceedings is limited, but important. The Court's job here is not to determine guilt or innocence, or to consider what fate might await Mr. Mazur in the Requesting State; the Court's job is to consider and decide just two issues: first, whether the crime charged is extraditable under the relevant Treaty, and, second, whether there is probable cause to sustain the charge. *See* 18 U.S.C. §3184; *Eain v. Wilkes*, 641 F.2d 504, 508 (7th Cir. 1984); *Prasoprat v. Benov*, 421 F.3d 1009, 1012, 1014 (9th Cir. 2005), *cert. denied*, 126 S.Ct. 1335 (2006).

### A. The Nature of the Offense

The Republic of Poland has indicated that Mr. Mazur is "not charged with direct participation in the murder of Marek Papala"; rather, "[t]he charge pressed against Edward Mazur concerns solely incitement of Artur Zirajewski to commit murder." *See* July 14, 2005 Information from the Appellate Prosecutor's Office in Warsaw, Relator's Exhibit 19, pp. 0585.[4] The Court must first determine whether this offense falls within the scope of what the Treaty defines as "extraditable offenses." The Extradition

---

[4] The Republic of Poland was very specific in identifying the charges against Mr. Mazur. Nevertheless, in its most recent submission, the government suggests that Mr. Mazur is also alleged to have incited Andrzej Zieliński to murder General Papala; this goes beyond what the Requesting State has charged.

Treaty between the United States and Poland provides that an offense shall be "extraditable" "if it is punishable under the laws of both Contracting States by deprivation of liberty for a maximum period of more than one year or by a more severe penalty." Treaty, Article 2, paragraph 1. Similarly, "[a]ny type of association to commit offense described in paragraph 1 of this Article, as provided by the laws of Poland" would also constitute an extraditable offense. Id., paragraph 2. The government's submission does not appear to include those provisions of the Polish Criminal Code specifying what term of imprisonment may be imposed on someone found guilty of the crime of "incitement," the charge pressed against Mr. Mazur. It is possible that the penalty for inciting a given crime is the same as the penalty for the crime incited; here, that would mean that Mr. Mazur, if convicted of inciting murder, would be subject under the relevant Polish regulations, to a term of imprisonment of 8 years or more (and potentially, subject to the death penalty), which would bring this crime within the Treaty's provisions.[5] See Government's Exhibit 3(II); Relator's Exhibit 19, pp. 0049-0050. But this inference is not compelled by the regulations that the government included; it is also possible

---

[5]Indeed, in its complaint, the government indicated that the penalty for the crime of incitement is 25 years to life, which would seem to be the penalty for murder under the Polish regulations in effect after September 1, 1998. It is unclear how the government arrived at this conclusion.

that the crime of incitement carries a lesser sentence than the
crime incited.

Likewise, given that murder would clearly fall within the
scope of paragraph 1 of Article 2, it is possible that the crime
charged - inciting another to murder - would fall within the
scope of paragraph 2 of Article 2, which makes "[a]ny type of
association to commit" an extraditable offense, an extraditable
offense itself. The government has not explained precisely how
it determined that the particular offense at issue here fits
within the language of the Treaty. The record does include
representations from the State Department and from the Polish
government that the crime would be covered by the Treaty, but
again the Court cannot discern how they arrived at this
conclusion.

In his Post-Hearing Memorandum, Mr. Mazur argues that, under
the plain language of the Polish Criminal Code, incitement
requires the commission of the underlying offense by the person
so incited; if this is so, Mr. Mazur could never be guilty of
incitement because he is alleged to have asked just three people
to commit the murder and it is physically impossible that any of
those three actually committed the murder (one was dead and the
other two were already in jail). See Post-Hearing Memorandum,
pp. 2-3. Article 18 states simply that "[a]ny person who,
wishing another to commit a prohibited act, induces him/her to do

44

so, is liable for incitement." *See* Government's Exhibit 3(II); Relator's Exhibit 19, p. 0049. Mr. Mazur argues that, by definition, this means that the person incited must actually commit the crime. If the crime of incitement is akin to what we call solicitation, it is likely that the commission of the underlying offense is immaterial. In Illinois, for example, "[a] person commits solicitation of murder for hire when, with the intent that the offense of first degree murder be committed, he procures another to commit that offense pursuant to any contract, agreement, understanding, command or request for money or anything of value." 720 ILCS 5/8-1.2. The offense "is complete when the principal offense is commanded, encouraged or requested with the intent that it be committed"; "whether or not the actual crime took place is meaningless. . . ." *People v. Edwards*, 243 Ill. App. 3d 280, 289, 611 N.E.2d 1196, 1202 (Ill. App. Ct. 1993). Indeed, in a July 14, 2005 memorandum, submitted in response to a request from the United States Embassy for additional information, the deputy appellate prosecutor explained, that "[u]nder Polish criminal law, incitement to commit a crime, including murder, is punishable regardless of whether the incited person did commit the act." *See* Relator's Exhibit 19, p. 0585. Neither the prosecutor, nor the government, has provided any legal authority for this proposition. Though, in response to Mr. Mazur's Post-Hearing Memorandum, the

45

government did include a letter from the Polish Director of the
Bureau of International Legal Cooperation reiterating that
"[i]nducement under Article 20 paragraph 1 of the Penal code Act
of 1969 - as well as under Articles 19 paragraph 1 of the
currently valid Penal Code Act of 1997 - need not result in a
completed crime." *See* July 11, 2007 Letter from Anna Adamiak-
Derendarz, Director of the Bureau of International Legal
Cooperation at the Polish Ministry of Justice, National
Prosecutor's Office to Michael Dittoe, U.S. Department of
Justice, Office of International Affairs, Criminal Division, p. 2
(attached as Exhibit 1 to the Government's Response to Mazur's
Post-hearing Memorandum). Further muddying the waters, according
to the regulations included with this submission, the sections
quoted by Ms. Adamiak-Derendarz are not the same sections
previously cited by the government; these new sections do not
mention the crime of "incitement" but cover "abetment" and
"aiding," which may or may not be the same within the meaning of
the Polish Criminal Code.

In the final analysis, the Court has no reason to doubt the
word of the representations of the Polish prosecutor and the
State Department's lawyer that the crime charged falls within the
language of the Treaty. Although it would have been better if
the evidence submitted had allowed the Court to make an
independent determination on this issue, the Court likely would

not deny the extradition request on this basis alone.  As explained below, however, this deficiency is not the only problem with the government's submission.

## B.  **Probable Cause**

The Court turns now to the probable cause question. "Extradition depends on probable cause to believe that [the relator] committed an offense covered by the extradition treaty." *DeSilva*, 125 F.3d at 1112 (citing *Bovio v. United States*, 989 F.2d 255, 258 (7th Cir. 1993); *Eain v. Wilkes*, 641 F.2d 504, 507-08 (7th Cir. 1981).  The extradition court "cannot resolve factual disputes; for that matter we cannot address most legal issues pertinent to the charges."  *Id*.

The extradition statute provides that:

[w]henever there is a treaty or convention for extradition between the United States and any foreign government, . . . any justice or judge of the United States, or any magistrate judge authorized so to do by a court of the United States, . . . may, upon complaint made under oath, charging any person found within his jurisdiction, with having committed within the jurisdiction of any such foreign government any of the crimes provided for by such treaty or convention, . . . issue his warrant for the apprehension of the person so charged, that he may be brought before such justice, judge, or magistrate judge, to the end that the evidence of criminality may be heard and considered. . . .  If, on such hearing, he deems the evidence sufficient to sustain the charge under the provisions of the proper treaty or convention, . . . he shall certify the same, together with a copy of all the testimony taken before him, to the Secretary of State, that a warrant may issue upon the requisition of the proper authorities of such foreign government, for the surrender of such person, according to the stipulations of the treaty or convention; and he shall issue his

47

> warrant for the commitment of the person so charged to
> the proper jail, there to remain until such surrender
> shall be made.

18 U.S.C. §3184 (2006). The hearing contemplated in the statute is limited in scope; it is not a trial on the merits of the charges upon which the extradition request is based, but is more in the nature of a preliminary hearing. *See Bovio v. United States*, 989 F.2d 255, 259 (7th Cir. 1993). Neither the federal rules of evidence, nor the federal rules of criminal procedure apply in these proceedings. *Eain*, 641 F.2d at 508. The relator's right to present and challenge evidence at the hearing is similarly limited. The relator can offer evidence that "explains" the requesting country's proof, but he may not offer evidence that "contradicts" that proof. *E.g., Eain*, 641 F.2d at 511. Evidence attacking the credibility of the government's witnesses is not permissible, as issues of credibility are to be resolved at trial. *Eain*, 641 F.2d at 511; *Bovio*, 989 F.2d at 259. On the other hand, evidence that "obliterates" probable cause is permissible. *E.g., Hoxha v. Levi*, 465 F.3d 554, 561 (3rd Cir. 2006); *Lindstrom v. Gilkey*, No. 98 C 5191, 1999 WL 342320, at *5 (N.D. Ill. May 14, 1999).

The Court's inquiry on probable cause is "whether there is evidence sufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief in the guilt of the accused." *Jenkins v. Bowling*, 691 F.2d 1225, 1230

(7th Cir. 1982); *In re Extradition of Salas*, 161 F.Supp.2d 915, 924 (N.D. Ill. 2001). "The determination of probable cause is one that necessarily accounts for the totality of circumstances and involves a practical, common sense judgment as to whether a fair probability exists that Petitioner has committed the charged offenses." *Kozumplik v. True*, No. 93 C 4731, 1994 WL 85990, at *3 (N.D. Ill. March 14, 1994)(citing *Illinois v. Gates*, 462 U.S. 213, 230, 246 (1983). As the Seventh Circuit described it, probable cause is "a soundly-based belief that the suspect may have committed a crime"; it is "less than a rule of more-likely-than-not, but how much less depends on the circumstances." *Gramenos v. Jewel Cos., Inc.*, 797 F.2d 432, 440 (7th Cir. 1986), *quoted in In re Extradition of Kulekowskis*, 881 F.Supp. 1126, 1140 (N.D. Ill. 1995).

Turning to the evidence presented, the Court notes at the outset that, if probable cause turned on sheer volume, the record in this case would likely be enough to satisfy any standard; it is quite lengthy, consisting as described above of the five volumes of documents presented by the government, plus the testimony, affidavits and exhibits presented at the extradition hearing. But probable cause is not established merely with quantity; the determination turns on the nature of the specific evidence presented. The Court first considers the testimony presented at the extradition hearing.

Although Mr. Mazur placed a great deal of stock in the hearing testimony of Ryszard Bieszynski, the Court does not. First, although the Court is not supposed to determine credibility issues, it was readily apparent that Mr. Bieszynski had an axe to grind with respect to the people seeking to prosecute Mr. Mazur; it is difficult to believe, as he suggested in his testimony, that he would cross an ocean, at (by his own account) considerable personal risk, to testify for a man he has never met, essentially, out of the goodness of his heart. But more importantly, Mr. Bieszynski's testimony is inappropriate in that it did nothing to explain the government's case against Mr. Mazur; it merely attempted to contradict it. And that is impermissible under the applicable law. *E.g.*, *Eain*, 641 F.2d at 511. So, while the Court appreciates Mr. Bieszynski's efforts on behalf of Mr. Mazur, it will give his testimony no weight.

Turning to the documentary evidence, the Court first considers the written statements of the government's star witness, Artur Zirajewski. Before discussing the substance of what Mr. Zirajewski had to say, the Court notes a couple of troubling aspects of the statements as submitted by the government. First, the Court was given abstacts of statements, not the statements themselves. The Court has no idea what else Mr. Zirajewski may or may not have said in the various interview sessions. Second, some of the extracts reflect obvious (though

seemingly trifling) errors. By way of example, one report shows
an interview beginning September 9, 1999 and ending April 9, 2002
– some eighteen months after it began, see Government Exhibit
3(III); another shows an interview beginning April 9, 2002 and
ending March 9, 2002 – a month before it began, see Government
Exhibit 6(III); another shows an interview beginning January 7,
2003 and ending, a month later, on February 7, 2003, see
Government Exhibit 7(III); still another suggests that an
interview began August 19, 1999 and ended April 6, 1999 – four
months before it began, see Government Exhibit 15(III).  These
errors may be innocently explained – they may be the result of
translation or transcription errors, they may be the result of
mistakes made when the record was being collated and assembled.
The Court is reluctant to view these errors, as Mr. Mazur urges,
as evidence of some sinister motive on the part of the
government.  But, in any case, the errors do tend to shake the
Court's confidence in the reliability of the records.

     The substance of the statements is more troubling.  First,
the government's submission includes fourteen statements from Mr.
Zirajewski, taken over a period of about four years; when read
together, they contain so many inconsistencies that it is
difficult to imagine that the government thought they could give
rise to probable cause.  In his first statement, dated April 9,
1999, Mr. Zirajewski stated that it was Tomek Nowosad who

accepted the contract to kill the "big dog from the capital";
that he attended a meeting at the Marina Hotel in March or April
of 1998 and that there were six men in total in attendance at
that meeting - Nikodem Skotarczak, Mr. Nowosad, Mr. Zirajewski,
and three men unknown to him.  *Id.*, p. 0172.  He stated that,
several days after the Marina meeting, he met Sergey, who told
him that Mr. Nowosad had "proposed him [Sergey] 'to do some
policeman.'"  *Id.*  Also on this date, Mr. Zirajewski identified
from a photographic array showing 93 men, the men he said he saw
with Mr. Nowosad; he did not identify Mr. Mazur - indeed, he did
not mention Mr. Mazur, did not mention an American businessman or
anything along those lines.  *Id.*, p. 0173.

Four months later, Mr. Zirajewski gave another statement;
this time, he made no mention of Mr. Nowosad.  This time, there
are four attendees at the Marina Hotel meeting (Nikodem
Skotarczak, Mr. Zirajewski and two men who were unknown to him,
but who Mr. Skotarczak told him were Slowik and Edward Mazur).
*See* Government's Exhibit 15(III); Relator's Exhibit 19, p. 0212.
After one initial mention of "Mazur," Mr. Zirajewski inexplicably
then started referring to "Edek" who Nikodem addressed as "Bako."
He stated that he had seen "Edek" before at a meeting with Mr.
Skotarczak that took place in a parking lot in Wilanów.  *Id.*, p.
0213.  Mr. Zirajewski stated in the August 19, 1999 statement
that he, not Mr. Nowosad, was responsible for hiring the hitman

and that he, not Mr. Nowosad, arranged for Sergey to play that role. *Id.*, p. 0212-13. He stated that he then attended another meeting at the Marina Hotel, with five other men – Messrs. Skotarczak, Nowosad, Kartofel and two men unknown to Mr. Zirajewski. Neither General Papala, nor the murder, were discussed at this meeting. *Id.*, p. 0213-0214.

A few weeks later, on September 9, 1999, Mr. Zirajewski gave another statement. This time, he described two meetings at the Marina Hotel. At the first, which was attended by Messrs. Skotarczak, Kartofel, Zirajewski and another man who Mr. Zirajewski recognized in the photographs (not Mr. Mazur), they generally discussed "killing a 'dog' from Warsaw" but no other details were discussed. Government's Exhibit 3(III); Relator's Exhibit 19, p. 0169. Mr. Zirajewski stated that he was responsible for securing the hitman and that he hired Sergey to do the job. *Id.* He stated that, at the second meeting, which was attended by Slowik and Mr. Mazur, he was shown pictures of General Papala. *Id.*, p. 0169.

Mr. Zirajewski's next interview, at least according to the records provided to the Court, was a year and a half later. This time, Mr. Zirajewski brought Mr. Nowosad back as the instigator, stating that "Nowosad probably met with Kartofel. They talked about a contract for killing some man from Warsaw." Government's Exhibit 16(III); Relator's Exhibit 19, p. 0216. This time,

according to Mr. Zirajewski, the Marina Hotel meeting was attended by Messrs. Zirajewski, Skotarczak, Kartofel and "Bako"; there was no talk about General Papala at this meeting. *Id.* He stated that there was a second meeting, attended by Messrs. Skotarczak, Zirajewski and two men unknown to him; he stated that the talk did not concern General Papala or murder but Mr. Skotarczak's conflict with Slowik. *Id.* This statement implicates Mr. Mazur, at best, with attending a meeting – at which the murder of General Papala was not discussed – with persons known to engage in organized crime activities.

Further undermining the reliability of Mr. Zirajewski's statements is the fact that, in several, Mr. Zirajewski either admits that he lied under oath, admits that he essentially made up the connection between Mr. Mazur and General Papala or he admits that he is providing information in exchange for a reduced sentence in the murder case for which he was being detained. In his May 30, 2001 statement, Mr. Zirajewski discussed two meetings that took place at the Marina Hotel; Mr. Zirajewski stated that General Papala was not discussed at either meeting, but that, after the first meeting, Nikoś – that is, Nikodem Skotarczak – told him there would be a contract for a hit in Warsaw. *See* Relator's Exhibit 19, pp. 0216. Significantly, Mr. Zirajewski stated that, after he was detained, and after he heard about General Papala's murder on the news, he, "built [the] hypothesis"

that the Marina Hotel meetings involved a contract to kill General Papala. *Id.* Worse yet, he admits that he offered this "hypothesis" "[o]n the basis of my own considerations" – that is, in an attempt to get a reduced sentence in the murder charge for which he was being detained. According to the government's submission, it worked; an "official note" states that Mr. Zirajewski "was placed under temporary detention on 29 April 1998 . . . as a person suspected of ordering and participation, . . . in the murder of Piotr Sulej. He placed extensive and credible testimony in this matter. Taking the above into account, the Court of the First Instance, imposed on him a penalty of 12 years imprisonment. The matter was referred for another consideration by a court of higher instance." Government's Exhibit 16(IV); Relator's Exhibit 19, p. 0356. In its most recent submission to the Court, the government confirms that Mr. Zirajewski received a reduced sentence for his cooperation. *See* Government's Response to Mazur's Post-Hearing Memorandum, p. 13.

In his May 30, 2001 statement, Mr. Zirajewski suggested that his earlier statements contained fabrications based upon his "hypothesis," but that the current statement was the truth; he stated, "[t]oday I gave bare facts without my commentary or conclusions." Relator's Exhibit 19, p. 0216. This is significant for Mr. Mazur's purposes because the May 30, 2001 statement attributed nothing about General Papala to Mr. Mazur.

Even if the Court were to accept Mr. Zirajewski's statement that Mr. Mazur and "Bako" were the same person, the only thing attributable to Bako is his presence at the first Marina Hotel meeting – where "there was no talk about Papala." Government's Exhibit 16(III); Relator's Exhibit 19, p. 0216. Simply being in the presence of people known to be associated with organized crime is not a crime – at least, it is not the basis for the extradition request. Mr. Zirajewski did say that, after the meeting, Nikoś told him there would be a contract for a hit in Warsaw, but he does not attribute anything about that to "Bako" or Mr. Mazur. He described a second meeting at the Marina Hotel, but does not include Mazur/Bako in the list of attendees, and he said that the purpose of the meeting was to discuss issues that had nothing to do with General Papala. Id., p. 0216. In short, the one statement Mr. Zirajewski gives that professes to be the gospel on this, does not implicate Mr. Mazur in any crime, and cannot be the basis for probable cause to believe that he incited someone to murder General Papala.

A statement dated January 7, 2003 begins with Mr. Zirajewski admitting that

in my first testimonies in this case I did not tell the whole truth because I was afraid for my safety and that of my loved ones, however I have decided to tell all I know, as I decided that when I tell everything I know, my situation would improve in the case that is currently heard before the District Court in Gdańsk, I had been earlier advised by interviewer in the case that the Criminal Code in article 60 paragraph 4

> provides for a possibility of mitigation of penalty in
> a situation when one reveals material circumstances of
> another case. In testimonies of 2002 I told the truth,
> withholding nothing, and possible discrepancies follow
> from the fact that I have been detained for almost five
> years now; also almost five years have lapsed from the
> event I witnessed.

Government's Exhibit 7(III); Relator's Exhibit 19, p. 0183. In

other words, by his own admission, Mr. Zirajewski is giving the

statement in an attempt to get a reduced sentence in the murder

case for which he is being held. This goes beyond questions of

credibility; it obliterates the government's only evidence of

probable cause. *See In re Singh*, 124 F.R.D. 571, 574-575 (D.

N.J. 1987).

True, Mr. Zirajewski would not be the first jailed witness

to provide testimony against another in the hope of getting a

deal for himself. And the existence of a motive to lie does not

automatically, by itself, take the evidence out of the probable

cause determination. But the key is whether the testimony bears

other independent *indicia* of reliability such that, despite the

motive to lie, despite the suspect nature of the testimony, the

evidence is otherwise able to support a probable cause finding.

For example, in *Molina ex rel. Molina v. Cooper*, 325 F.3d 963

(7th Cir. 2003), the Seventh Circuit held that, although the

witness had a motive to lie (he was trying to get himself a

deal), his testimony was nonetheless reliable for two reasons:

first, the statement was against the witness' own penal interest,

in that he also implicated himself in the crimes charged; and, second, the testimony was independently corroborated, and was detailed, concrete and clearly based on first-hand observation – all, according to the court, "strong indicia of reliability." *Id.*, at 970-971 (citing *Illinois v. Gates*, 462 U.S. 213, 234 (1983); *United States v. Jones*, 208 F.3d 603, 609 (7th Cir. 2000); *United States v. Leidner*, 99 F.3d 1423, 1429-30 (7th Cir. 1996); *United States v. Reddrick*, 90 F.3d 1276, 1280 (7th Cir. 1996). Similarly, in *Eain v. Wilkes*, the Seventh Circuit held that "[a]n accomplice's accusations are not automatically incompetent" and may be sufficient to support a determination of probable cause where, for example, the accusations go against the witness' own penal interest or where the witness' testimony is corroborated by further facts. *Eain*, 641 F.2d at 510. Such *indicia* of reliability are lacking with regard to Mr. Zirajewski.

Mr. Zirajewski did not implicate himself in the crime; in some statements he said he hired the hitman (though not the hitman who ultimately committed the murder), in others he said someone else was responsible for that. Indeed, Mr. Zirajewski's role in the scheme changed from statement to statement. Nor is his testimony independently corroborated. The only witness to corroborate anything about a meeting at the Marina Hotel is Artur Zieliński. And, as the Court will explain below, his testimony is suspect as well. More significantly, two of Mr. Zieliński's

statements completely contradict Mr. Zirajewski's statements, and the one statement that does corroborate his statement is similarly unhelpful; although it corroborates the notion of a meeting at the Marina Hotel, it undermines it in a very serious respect: Mr. Zieliński said Mr. Zirajewski was not present at the meeting. In short, Mr. Zieliński's statements do nothing to make Mr. Zirajewski's inherently suspect statement reliable. And there is nothing else in the record to strengthen the character of Mr. Zirajewski's testimony.

The government emphasizes that Mr. Mazur was in Poland at the very time Mr. Zirajewski claims he solicited him to murder General Papala. And it suggests that this fact independently corroborates Mr. Zirajewski's account. First, Mr. Zirajewski never pinned down the exact timeframe of the solicitation; he said the meetings at the Marina Hotel occurred in February or March or April of 1998, and he said he knew things happened before April 8, 1998, which was the day his car was blown up. The government's argument might be stronger if Mr. Zirajewski had nailed down a specific date - or even a specific week - and Mr. Mazur had been present at that time. But, even then, as the travel documents submitted by the government make clear, Mr. Mazur was in Poland all the time. *See* Government's Hearing Exhibit 1. The records, which cover the period from April 1991 through March 2002, show that Mr. Mazur traveled to Poland, on

average, at least ten times each year, sometimes staying for weeks at a time. *Id.* His travel during the period when the "incitement" is supposed to have occurred is typical of his travel pattern during the decade covered by the government's records – the years before and *after* the period included in Mr. Zirajewski's statements, the years during which no wrongdoing is alleged to have occurred. In any given month or two-month period, the odds were extremely high that Mr. Mazur would be in Poland. Thus, it is simply not possible to attach any significance to the fact that Mr. Mazur was present in the country within the very general timeframe described by Mr. Zirajewski.

Finally, the government makes much of Mr. Zirajewski's identification of Mr. Mazur in the line-up on February 27, 2002. Having now seen the pictures documenting that display, the Court finds that this identification undermines, rather than bolsters, the government's probable cause showing. As even Agent Boertje admitted, the three other men appearing in the line-up bear little resemblance to Mr. Mazur. Most troubling is the fact that the other three men are dressed in dark, subdued colors, whereas Mr. Mazur is wearing a bright red, slightly oversized jacket. And, significantly, despite representations to the contrary at the hearing, the government now concedes that the Polish authorities "asked Mazur to remove his business suit and gave him

an everyday type of red jacket to wear over his business shirt *in an effort to make his dress look less formal."* *See* Government's Response to Mazur's Post-Hearing Memorandum, p. 15 (emphasis added). They may as well have made him wear a target on his chest or a sign over his head saying "pick me." Mr. Zirajewski's identification would never pass muster in this country. Given that Mr. Zirajewski's statements contain no prior description of Mr. Mazur – on the contrary, when asked about it, he stated that he was unable to describe Mr. Mazur, *see* Relator's Exhibit 19, p. 0213 (August 19, 1999 statement), his identification of Mr. Mazur in the unduly suggestive line-up is highly suspect. *See, e.g., Kyles v. Whitley*, 514 U.S. 419, 444 (1995)(reliability of identification following impermissibly suggestive line-up depends in part on accuracy of witness' prior description)(citing *Neil v. Biggers*, 409 U.S. 188, 199 (1972)); *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977). Indeed, the government's reliance on this identification is shocking and offensive, particularly in light of the recent revelation that the red jacket was foisted upon him by the Polish authorities.[6]

The government's next witness, Andrzej Zieliński is no more

---

[6]Amazingly, despite the recent admission that the Polish authorities made Mr. Mazur remove his suit coat and don instead the red fleece, the government persists in accusing Mr. Mazur of lying when he swore, in his affidavit, that he wore a suit during the line-up. *See* Government's Response to Mazur's Post-Hearing Memorandum, p. 15.

reliable than Mr. Zirajewski. On July 26, 2004, Mr. Zieliński
was confronted with Mr. Zirajewski's testimony concerning his
presence at the Marina Hotel, and he flatly denied it; he said he
didn't know Mr. Mazur, didn't know Mr. Zirajewski and did not
recall meeting with Mr. Skotarczak at the Marina Hotel except for
one time, and that had nothing to do with General Papala, Mr.
Mazur or murder. That statement was consistent with a statement
he gave six weeks earlier, on June 16, 2004; at that time, Mr.
Zieliński gave the same story: he said nothing about Mr. Mazur or
the Papala murder; indeed, an attachment documenting the
"undisclosed part of the report" indicates that Mr. Zieliński
"confirms his acquaintance with Ryszard Bogucki, but he denies
the fact of meeting and having a conversation in Gdańsk, at the
Marina Hotel, with Edward Mazur and Artur Zirajewski in April
1998." Government's Exhibit 5(IV); Relator's Exhibit 19, p.
0292. Then, in a complete about face almost two years later, on
June 23, 2006, Mr. Zieliński, in an apparent epiphanous moment,
confirmed Mr. Rażniak's account, and confirmed that he had told
Mr. Rażniak about a meeting he had with Nikodem Skotarczak and
Edward Mazur where "the order to kill Marek Papala had been
mentioned." Government's Exhibit 3(IV); Relator's Exhibit 19, p.
0260. The government argues that Mr. Zieliński changed his story
and decided to tell the truth because he realized that his friend
- Mr. Razniak - had turned against him; Mr. Mazur argues that Mr.

Zieliński pointed the finger at him because he realized that he could help himself if he adopted Mr. Razniak's story. Frankly, the record does not allow the Court to determine which is the more likely scenario, though it does seem odd that Mr. Zieliński said nothing until Mr. Ražniak handed him the story.

Significantly, although the government attempts to characterize Mr. Zieliński's statement as being corroborative of Zirajewski's account, it is not. In fact, Mr. Zielinski's June 23, 2006 statement undermines Mr. Zirajewski's story in one very important aspect: Mr. Zieliński specifically stated that the meeting at the Marina Hotel included just him, Mr. Skotarczak and Mr. Mazur; he specifically stated, when asked whether Mr. Zirajewski was there, "I do not remember this man, I cannot recognise him." *See* Relator's Exhibit 19, p. 0261.

Finally, with regard to Mr. Zieliński, the Court notes that the June 23, 2006 statement, the only one to implicate Mr. Mazur, is further suspect because of its self-serving nature. Unlike the statements in *Eain*, which were deemed to be reliable, in large part, because they amounted to admissions against the interest of the witness who made them, *see Eain v. Wilkes*, 641 F.2d at 510 (statements of accomplice reliable because they were against his own interest), Mr. Zieliński's statement, if believed, indicts him of nothing criminal; at worst, his statement suggests that he was guilty of trying to help his dear

friend get out of jail sooner and of trying to swindle a man who was planning to have Poland's top policeman killed. Like Mr. Zirajewski's statements, Mr. Zieliński's June 23, 2006 statement lacks any *indicia* of reliability and does not give rise to probable cause; the government implicitly acknowledges as much in choosing to rely on Mr. Zirajewski's statements instead of Mr. Zieliński's statements.

The Court will not engage in speculation as to why the Polish National Prosecutor's Office submitted the additional statements of Zygmunt Raźniak and Andrzej Zieliński to the Department of Justice on July 7, 2006. The cover letter indicates that the submission was pursuant to earlier correspondence between the parties. What is clear, however, is that these additional statements were procured by the Prosecutor on June 9 and June 23, 2006, more than one year after the April 4, 2005 formal request for Mr. Mazur's extradition and more than eight years after the alleged events. If these statements were intended to bolster probable cause, they failed miserably.

The statements of Marcin Puczyński are easily the most reliable of all of the evidence in the record; Mr. Puczyński appears to have no criminal history and no motive to lie. Yet, a close examination of his statements reveals that they cannot support a finding of probable cause to believe that Edward Mazur incited Artur Zirajewski to murder General Papala. First,

although this evidence is highly unfavorable to Mr. Mazur, suggesting as it does that he spent time with a man known to be involved in organized crime, *see* Official Police Note on Rafal Kanigowski, Relator's Exhibit 19, p. 0371-0375, that is not the crime for which the Republic of Poland is seeking extradition. Mr. Puczyński's statements do not implicate Mr. Mazur in General Papala's murder or in the incitement of General Papala's murder; the statement about the disposal of a package, which Mr. Kanigowski said contained "Papala's things," would likely be enough to link Mr. Kanigowski to the crime. But there is nothing in Mr. Puczyński's statements to link the package, the calls about the package or Mr. Kanigowski's strange behavior to Mr. Mazur. Most significantly from the Court's perspective, Mr. Puczyński's statements do nothing to corroborate Mr. Zirajewski's statements. Indeed, Mr. Zirajewski, in all of his fourteen statements, never even mentioned Mr. Kanigowski.

The statements of Mr. Trella, another Polish criminal is similarly worthless; at best, he put Mr. Mazur in the presence of Mr. Skotarczak – not favorable, but not criminal. He offered nothing from which the Court could conclude that Mr. Mazur incited Artur Zirajewski to murder General Papala. And he offered nothing in the way of corroboration for Mr. Zirajewski's statements; again, Mr. Zirajewski never even mentioned him.

At first blush, there would seem to be an awful lot of

evidence connecting Edward Mazur - a man with no known criminal
history in either of his home countries - to various people known
by the Polish authorities to be involved in organized crime
activities. That is surprising (given what the Court knows about
Mr. Mazur's existence here in the United States), but not
criminal. The Republic of Poland is seeking to extradite Mr.
Mazur to face charges that he incited Artur Zirajewski to murder
General Papala, and this Court is obliged to grant that request,
but only if the evidence gives rise to "a soundly-based belief
that the suspect may have committed [the] crime." *Gramenos*, 797
F.2d at 440. The evidence gives rise to, at most, a soundly-
based belief that Mr. Mazur was hanging out with some rather
shady characters. But that alone is not enough to send him to
Poland; on close inspection, the evidence does not give rise to
probable cause to believe that he incited murder. To the extent
the evidence supports the notion that one of these shady
characters murdered General Papala, the evidence would not permit
any court to hold Mr. Mazur accountable for those actions. True,
Mr. Mazur was with General Papala on the night he was killed; but
Mr. Mazur's affidavit - which is corroborated by Berlitz business
records and the statement of General Papala's widow - explains
that evidence away entirely and obliterates any notion of
probable cause stemming from this fact. Even Mrs. Papala
admitted that her husband and Mr. Mazur were friends; indeed, she

stated that her husband had contacted Mr. Mazur about arranging the language course.

This Court is not charged with determining guilt or innocence; nor is this Court permitted to simply hand over a United States citizen on the word of a prosecutor, coupled with conclusory allegations and unsubstantiated, unreliable evidence. *See U.S. v. Fernandez-Morris*, 99 F.Supp.2d 1358, 1366 (S.D.Fla. 1999). If presented at a preliminary hearing in this country, Mr. Zirajewski's contradictory, self-serving statements and his suspect identification of Mr. Mazur would be deemed unreliable and the case would be thrown out. The Court does not see why a different result should obtain simply because a foreign government is presenting the evidence; certainly, it is hard to imagine that Mr. Mazur, a United States citizen, should be penalized in terms of his rights, because of that.

This Court is mindful of the deference to which the decisions of a foreign government are entitled in extradition matters. It is because of such deference that courts rarely seem to deny extradition requests; indeed, in its twelve and one half years on the bench, this Court has never denied a request for extradition, has never even come close to doing so. But the Court is not merely a rubber stamp for a foreign government's decision that probable cause exists, such that an American citizen should be held to answer criminal charges in that

country. In our system of justice, each case must be decided based on the particular evidence presented therein. And, in this case, the evidence presented fell short of the mark.

For reasons that remain unclear to this Court, the Republic of Poland has pursued extradition based upon selected statements given by Artur Zirajewski - a known scoundrel and unmitigated liar - implicating Mr. Mazur, without addressing all of the other statements given by this witness that, not only do not implicate Mr. Mazur, but contradict what Mr. Zirajewski said in the statements emphasized by the government. While it is true that the Court may not consider issues relating to the credibility of witnesses whose statements form the basis of the government's extradition request, *see Sahagian v. United States*, 864 F.2d 509, 514 n.6 (7th Cir. 1988); *Eain*, 641 F.2d at 511; *Bovio*, 989 F.2d at 259, that prohibition does not require the Court to accept, without question, statements that are riddled with admitted lies and are so inconsistent as to be rendered wholly unreliable. If that were the case, the judicial function in extradition cases would be rendered meaningless and this Court would truly be a rubber stamp for the government.

The Court has evaluated all of the evidence presented by the parties, and, consistent with the standards set forth above, it declined in some instances to hear or consider evidence that merely contradicted the government's evidence. In the final

68

analysis, the evidence that Mr. Mazur presented was not what did
in the government's case; rather, it was the evidence presented
by the government itself that sealed the deal.    That evidence,
though seemingly damning on its face, on close scrutiny, turned
out to be so internally inconsistent, so patently unreliable,
that it obliterated, all on its own, any semblance of probable
cause.

## CONCLUSION

For the reasons set forth above, and upon consideration of
the entire record, the Court finds that the government has failed
to meet its burden under the Extradition Treaty between the
United States and the Republic of Poland and under the federal
extradition statutes.    Accordingly, the Court denies the request
for extradition with regard to Edward Mazur.

Dated: July 20, 2007

ENTER:

ARLANDER KEYS
United States Magistrate Judge